## EXHIBIT A

smobley(1)

1

```
1

2              IN THE COURT OF COMMON PLEAS

3        FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

4               CRIMINAL TRIAL DIVISION

5

6                    -   -   -

7    COMMONWEALTH              :
                               :
8        vs.                   :
                               :
9    SHAWN MOBLEY          :CP-51-CR-0003485-2016

10                   -   -   -

11               April 3, 2017

12    Courtroom 704, Criminal Justice Center

13         Philadelphia, Pennsylvania

14                   -   -   -

15               MOTION

16                   -   -   -

17

18

19    BEFORE:  THE HONORABLE VINCENT MELCHIORRE, J.

20

21

22
```

smobley(1)

23

24

25

↑

2

1

2  APPEARANCES:

3  ZACHARY WYNKOOP, ESQUIRE
   Assistant District Attorney
4  For the Commonwealth

5  BERTO ELMORE, ESQUIRE
   Counsel for the Defendant
6

7

8

9

10

11

12

13

14

15

16

17

18

19

smobley(1)

20

21

22

23

24

25

3

1

2                      I N D E X

3              COMMONWEALTH'S EVIDENCE

4   WITNESS              DIR.   CR.   REDIR. RECR.

5   Officer Farley        8      20      37

6                 E X H I B I T S

7   NUMBER  DESCRIPTION            FOR ID

8                 (None marked.)

9                     I N D E X

10              DEFENSE EVIDENCE

11  WITNESS              DIR.   CR.   REDIR. RECR.

12                 (None called.)

13                E X H I B I T S

14  NUMBER  DESCRIPTION            FOR ID

15  D-1    Photograph              26

16  D-2    Photograph              26

smobley(1)

| 17 | D-3 | Photograph | 26 |
| 18 | D-4 | Photograph | 28 |
| 19 | D-5 | Notes of testimony | 35 |

20

21

22

23

24

25

4

| 1 | COMMONWEALTH VS MOBLEY |
| 2 | THE CRIER:  Okay.  This is Case No. |
| 3 | 3, Shawn Mobley. |
| 4 | It's my understanding defense has a |
| 5 | motion to suppress? |
| 6 | MR. ELMORE:  Yes, I do, Judge. |
| 7 | Judge, I want to ask the Court, does |
| 8 | the Court mind if I remain seated? |
| 9 | THE COURT:  No.  The DA may remain |
| 10 | seated as well. |
| 11 | MR. WYNKOOP:  Thank you, Your Honor. |
| 12 | THE COURT:  And Mr. Mobley is in the |
| 13 | room. |

smobley(1)

| 14 | MR. ELMORE: Yes. |
|----|------------------|
| 15 | THE COURT: Police Officer Keyes is |
| 16 | the Commonwealth's expert witness is in |
| 17 | the room. |
| 18 | And the other officer? |
| 19 | MR. WYNKOOP: That officer is not on |
| 20 | this matter. |
| 21 | THE COURT: Okay. Sequestration is |
| 22 | in effect, and defense you may state |
| 23 | your grounds. |
| 24 | MR. ELMORE: Your Honor, I have a |
| 25 | motion to suppress that the evidence |

♠

5

| 1 | COMMONWEALTH VS MOBLEY |
|---|------------------------|
| 2 | seized in this particular case, the |
| 3 | drugs, were seized in violation of the |
| 4 | United States Constitution, 4th |
| 5 | Amendment, also under the Pennsylvania |
| 6 | Constitution, Article I, Section 8. |
| 7 | Your Honor, in this particular case, |
| 8 | we have a motion to suppress that the |
| 9 | search warrant, well, there's two or |
| 10 | three prongs in this particular case; |

smobley(1)

| 11 | one, is that the entry and search of |
| 12 | the premises by the police officer, the |
| 13 | initial police officer was done without |
| 14 | permission.  There's no exigent |
| 15 | circumstances to enter the prem -- to |
| 16 | enter the premises. |
| 17 | Number two, there was a search |
| 18 | warrant issued, but based on the fact |
| 19 | that the search warrant would be |
| 20 | invalid because the warrant was |
| 21 | obtained after illegal entry into the |
| 22 | house, and then search of the premises. |
| 23 | Then the arrest of my client obviously |
| 24 | is tainted and anything recovered from |
| 25 | him are fruits of the poisonous tree |

6

| 1 | COMMONWEALTH VS MOBLEY |
| 2 | from the illegal entry into the house. |
| 3 | Basically, Judge, what we have is a |
| 4 | house and the officers entry into that |
| 5 | house is in violation of the |
| 6 | constitution, as well as the Rules of |
| 7 | Criminal Procedure in terms of the |

Page 6

smobley(1)

8          manner of entering a person's house.

9              And it's also one of the areas at

10         issue that I'm going to raise in terms

11         of no knock.  They just went inside the

12         house.  So they're bringing in the

13         Rules of Criminal Procedure as well.

14             THE COURT:  Okay.  Thank you.

15             You may proceed.

16             MR. WYNKOOP:  Your Honor, if I

17         could, I just wanted to clarify in

18         Courtroom 704, do you do the motion to

19         quash after we do the motion to

20         suppress because I have a motion to

21         quash here that I believe we were doing

22         that first?

23             THE COURT:  I had no idea there was

24         a motion to quash.

25             MR. WYNKOOP:  I do have a copy of a


                                              7

1          COMMONWEALTH VS MOBLEY

2          motion to quash from Mr. Elmore.  I

3          don't know if he filed it with the

4          Court.

smobley(1)

| | |
|---|---|
| 5 | MR. ELMORE: Oh, no, we're not doing |
| 6 | that. That was just one of the things |
| 7 | I checked. |
| 8 | MR. WYNKOOP: Understood. |
| 9 | Then Your Honor we're ready for a |
| 10 | motion to suppress. |
| 11 | THE COURT: So there is no motion to |
| 12 | quash? |
| 13 | MR. ELMORE: No. |
| 14 | THE COURT: Because we had talked |
| 15 | about this earlier, and that wasn't |
| 16 | mentioned. So counsel verified there |
| 17 | is no motion to quash. |
| 18 | MR. WYNKOOP: And with the Court's |
| 19 | permission, the Commonwealth would call |
| 20 | Police Officer Farley. |
| 21 | THE COURT: Thank you. |
| 22 | THE CRIER: Please remain standing. |
| 23 | State for the record your name, spell |
| 24 | your name, badge number, your |
| 25 | assignment please. |

8

1                COMMONWEALTH VS MOBLEY

smobley(1)

| 2 | OFFICER FARLEY:  Police Officer |
| 3 | Steven Farley, with a v, F-a-r-l-e-y, |
| 4 | Badge No. 4716, currently assigned to |
| 5 | the 19th District. |
| 6 | THE CRIER:  Raise your right hand. |
| 7 | OFFICER FARLEY, having been duly |
| 8 | sworn, was examined and testified as |
| 9 | follows: |
| 10 | THE COURT:  Good morning. |
| 11 | THE WITNESS:  Good morning, Your |
| 12 | Honor. |
| 13 | THE COURT:  You may proceed. |
| 14 | MR. WYNKOOP:  Thank, Your Honor. |
| 15 | - - - |
| 16 | DIRECT EXAMINATION |
| 17 | - - - |
| 18 | BY MR. WYNKOOP: |

19  Q.    Officer Farley, good morning.

20  A.    Good morning.

21  Q.    Officer Farley, I want to take you back to

22  March 1st of last year.  Were you working then as

23  a Philadelphia police officer?

24  A.    Yes.

25  Q.    And, specifically, what district were you

Page 9

smobley(1)

9

1                    COMMONWEALTH VS. MOBLEY

2    working in, Officer Farley?

3    A.    The 19th District.

4    Q.    And does that district encompass 728 North

5    63rd Street?

6    A.    Yes.

7    Q.    And did your tour of duty take you to that

8    location that evening?

9    A.    It did.

10   Q.    And was that approximately 10:30 p.m.?

11   A.    Yes.

12   Q.    Officer Farley, at that date, time, and

13   location did you encounter anybody that you see

14   in the courtroom today?

15   A.    Yes.  The gentlemen with the -- it looks

16   like a blue sweater.

17              MR. WYNKOOP:  By point of finger and

18              article of clothing, the officer has

19              identified the defendant for the

20              record, Your Honor.

21              THE COURT:  So noted.

22   BY MR. WYNKOOP:

Page 10

smobley(1)

23  Q.    Officer Farley, when you first encountered

24  the defendant that evening, where was he?

25  A.    On the side of the house.  Your Honor, it

10

1                    COMMONWEALTH VS. MOBLEY

2   was like a twin, a twin house, so it was towards

3   the rear of the home and on the side.

4   Q.    And is there anybody else outside with this

5   defendant?

6   A.    Yes, there were multiple people.

7   Q.    And can you describe for His Honor the

8   scene that you came upon when you arrived on the

9   location?

10  A.    It looked like there was a disturbance out

11  there.  There was a lot of yelling and screaming.

12                    MR. ELMORE:  Objection.  I would ask

13               that he be instructed to testify not  to

14               what it  seems, but what he saw.

15                    THE COURT:  Well, I mean he has to

16               see it and process it, so what is it

17               that you saw?

18                    THE WITNESS:  Yelling back and

19               forth.

Page 11

smobley(1)

20  BY MR. WYNKOOP:

21  Q.      Officer Farley, what other information led

22  you to believe that there was a disturbance going

23  on at that location?

24  A.      I spoke to both parties.  I spoke to the

25  defendant.  I spoke to -- the defendant stated to

11

1                    COMMONWEALTH VS. MOBLEY

2  me that he owned the property and that he was the

3  landlord of the property.  And the other people,

4  I believe, they were tenants on the third floor.

5  There was multiple people and I spoke to them and

6  there had been a dispute over shutting off the

7  electricity.

8  Q.      Where were the electrical panels?

9  A.      In the basement.

10  Q.     And who was it that was trying to shut off

11  the electricity?

12  A.     The defendant.

13  Q.     And, Officer Farley, when you said that you

14  arrived and there were parties yelling, was the

15  defendant one of those parties?

16  A.     Yes.

smobley(1)

17  Q.     Officer Farley, after your initial

18  assessment of what's going on at the scene, did

19  you interact again with the defendant?

20  A.     Yes.  After, Your Honor, after we thought

21  we had straightened or did the best we could to

22  straighten out the initial dispute as far as the

23  landlord and the tenant electricity, the

24  defendant came back.  He's out front speaking to

25  my partner.  I was speaking to the other party.

12

1                COMMONWEALTH VS. MOBLEY

2  When we were getting ready to leave he said he

3  was leaving and he needed to retrieve his keys.

4  He said he left them in the basement.

5                When we went back to -- there was a

6  metal gate outside the steps, Your Honor.

7                So there was a metal gate, the door,

8  like a chain door if I recall correctly, and it

9  led down the steps to a little landing and then

10  on the left side there was a door that led into

11  the basement.  On the very top where the metal

12  gate was, there was a chain and a padlock that

13  had been placed on there.  It was not a

Page 13



smobley(1)

14  combination lock but one with a key and it had

15  been placed there by the third floor --

16          MR. ELMORE: Objection. He didn't

17          see it.

18          THE COURT: Unless he has specific

19          knowledge.

20          THE WITNESS: The gentleman told me

21          that he put the lock on the door.

22          THE COURT: The third floor tenant

23          said that?

24          THE WITNESS: Correct. I believe

25          his name was Ibrahim Howard (ph).

13

1               COMMONWEALTH VS. MOBLEY

2   A.      So at that point the door was unlocked. I

3   went back into the basement with the defendant

False —  4   along with Officer Lee. When I went down into

5   the basement I smelled what I believed to be

6   burnt marijuana.

7   Q.      Officer Farley, if we could pause for a

8   second and go back. When the defendant

9   discovered the padlock on his basement door what

10  was his reaction?

Page 14

smobley(1)

11   A.     He was upset, and he said they couldn't do

12   that.

13   Q.     Okay.  And how was anybody able to get that

14   padlock off?

15   A.     The gentleman had told me that he locked

16   it, he had the key, and he unlocked it.

17   Q.     And can you describe for the Court how you

18   end up in the basement with the defendant?

19   A.     We were still just kind of talking, like

20   still just doing the job, following him, went

21   down with him, just to assist him with finding

22   his keys.  I had my flashlight.  We just went

23   down in the basement.

24   Q.     And throughout the evening the

25   conversations you were having with the defendant

14

1                     COMMONWEALTH VS. MOBLEY

2   that night, what was the basis of those

3   conversations?

4   A.     Just everything as far as what he was doing

5   as a landlord.

6   Q.     Now, after smelling the burnt marijuana in

7   the basement does the defendant remain in the

Page 15

smobley(1)

8   basement?

9   A.    Yes.   He was looking around for, he said

10  his keys.  Your Honor, I remember when I went

11  down, on the right-hand side, there was, it

12  looked like shelving there, was a set of keys

13  hanging.  I did notice the defendant walked by

14  them and not grab them.  He seemed to be pacing

15  back and forth.  He stated to me -- he stated to

16  me that he thought the tenants stole his keys,

17  and I told him that I didn't believe that

18  happened because I hadn't seen anyone go to the

19  basement, and I pointed out, I said, "Are those

20  your keys right there?"  And just real quick he

21  said "Oh, yeah, they're mine," and we exited the

22  basement.

23  Q.    After you exited the basement, did you and

24  your partner leave the scene?

25  A.    We were getting ready to, we were going to

15

1              COMMONWEALTH VS. MOBLEY

2   try -- well not try.  I spoke to the defendant

3   and the defendant said there were two keys to the

4   locks, and we worked out an agreement where he



smobley(1)

5   Was going to keep a <u>key</u> and the tenant was going

6   to keep a <u>key</u>. False

7                 [And when I went to <u>give</u> him <u>his</u> <u>key</u>,] False

8   I noticed the defendant left the location and at

9   that point I also noticed the chain, I don't

10  recall if the lock was gone, but I know that the

11  chain was gone because we weren't able to secure

12  the door.

13  Q.     And as a result of you and your partner not

14  being able to secure the basement door, what did

15  you do next?

16  A.     I went back into the basement.  When we

17  went in there he had referred to it as his

18  office.

19  Q.     When you say "He referred to it as his

20  office," who are you referring to?

21  A.     I'm sorry.  The defendant.

22  Q.     Okay.  What were you looking for down

23  there, when you returned to the basement?

24  A.     Just something to secure the door.  Because

25  it looked like he, you know, being the landlord,

16



2    I was kind of hoping to find something to secure

3    the door with.

4    Q.    And did you eventually find something to

5    secure the door with?

6    A.    Well, later on.

7    Q.    I'll rephrase that question, Officer

8    Farley.  Did you find something to secure the

9    door within the basement?

10   A.    No.  At that time, I went back into the

11   basement, Your Honor, I started noticing more so

12   than the burnt marijuana smell, I started

13   smelling unburnt marijuana.  And as I was walking

14   just looking for something to secure the door

15   with, I noticed in the back, the rear part of the

16   basement, there's a desk and I saw unused

17   baggies.  I recognized the packaging material for

18   narcotics and I also saw a digital scale sitting

19   on top of the desk.

20             And then I also saw a bag on the

21   floor and it had bulk marijuana in there.

22   Q.    And, Officer Farley, you mentioned during

23   your testimony today, that at different times you

24   smelled both burnt and unburnt marijuana in the

25   basement.  Can you describe to the Court what you

Page 18

smobley(1)

17

```
 1              COMMONWEALTH VS. MOBLEY
 2  believe the difference between the two to be?
 3  A.     It's kind of hard to describe, Your Honor.
 4  It's just more off of experience.  Like I can
 5  tell you what a raw onion smells like and what a
 6  fried onion smells like but I don't know if I can
 7  articulate it.  There's definitely a difference
 8  though, that I recognize.
 9              THE COURT:  If I may, the burnt
10              would be after someone smoked
11              it?
12              THE WITNESS:  Yes, it just has a
13              different smell to it.
14  BY MR. WYNKOOP:
15  Q.     Now you described the different smells,
16  Officer, and you mentioned your experience.
17              How long have you been a member of
18  the Philadelphia Police Department?
19  A.     A little bit over seven years.
20  Q.     And in those seven years, how much time
21  have you spent in the 19th Police District?
22  A.     The whole time, I've been in the 19th
```

Page 19

smobley(1)

23  District.

24  Q.     And in your time in the 19th Police

25  District, prior to March 1st of 2016, which would

18

1                 COMMONWEALTH VS. MOBLEY

2  have been approximately six years on the job, had

3  you encountered marijuana before?

4  A.     Correct.  Yea.  I wouldn't say daily but 89

5  percent of my time that I patrol, I do smell

6  burnt marijuana and a lot of the times, I smell

7  unburnt marijuana also.

8  Q.     Other than smelling burnt and unburnt

9  marijuana as a police officer, have you seen

10  marijuana?

11  A.     Yes.

12  Q.     Approximately how many times have you seen

13  it?

14  A.     If I had to guess, I would say in the

15  hundreds, maybe even into a thousand times.

16  Q.     And based on your experience, did you

17  recognize that baggie in the basement to contain

18  marijuana?

19  A.     Yes.

smobley(1)

20  Q.    Officer Farley, upon noticing unburnt

21  marijuana, the scale and the baggie what action

22  did you take next?

23  A.    At that point I went and told Officer Lee

24  what I had discovered, and while speaking to

25  Police Officer Lee I saw the defendant walking

19

1              COMMONWEALTH VS. MOBLEY

2  southbound on 63rd Street.  He had the chain in

3  his hand.  We came up and at that time, I placed

4  him under arrest.  I notified my supervisor, and

5  other 19th District personnel secured the

6  location and obtained a search warrant.

7  Q.    Now, Officer Farley, if we could go back

8  for just a second, when you and the defendant

9  initially go into the basement, who goes down

10  first?

11  A.    The defendant.

12  Q.    And as you go after him and you two were

13  talking did he turn around and say "Stop"?

14              MR. ELMORE:  Your Honor, I'm going

15          to object.  I've given him a lot of

16          leeway, I believe, to leading

Page 21

smobley(1)

17          questions.

18               I'm going to now object.

19               THE COURT:  I'm going to sustain it

20          as to the question, did he say.  You

21          have to ask something like did the

22          defendant say anything.  You don't

23          suggest an answer in the question.

24               So I'll sustain that.

25  BY MR. WYNKOOP:

20

1               COMMONWEALTH VS. MOBLEY

2  Q.    Other than the conversation that you were

3  having about the landlord/tenant dispute, as you

4  were entering into the basement, did the

5  defendant say anything else to you?

6  A.    No.

7               MR. WYNKOOP:  Your Honor, I don't

8          have any further questions.

9               I'd offer for cross.

10              THE COURT:  Thank you.

11              You may cross.

12                        -  -  -

13              CROSS-EXAMINATION

smobley(1)

14                    -   -   -

15  BY MR. ELMORE:

16  Q.    Officer, now you just testified there was a

17  landlord/tenant situation at that location; is

18  that correct?

19  A.    Yes.

20  Q.    And most of the time -- isn't there

21  directives that police don't get involved in

22  landlord/tenant disputes?

23              MR. WYNKOOP:  Objection, Your Honor.

24              It's irrelevant through speculation.

25              THE COURT:  Well, I mean, he can


                                            21

1              COMMONWEALTH VS. MOBLEY

2              answer the question.  Whether he may or

3              may not know, I mean, I don't know if

4              it makes a difference.

5              THE WITNESS:  Your Honor, we respond

6              very often to landlord/tenants.  What

7              we do is we advise both parties, it's a

8              civil matter not a police matter.

9              THE COURT:  If there's an

10             altercation of some sort?

smobley(1)

11              THE WITNESS:  Yea, if there's an

12          altercation, yes.

13 BY MR. ELMORE:

14 Q.    And this situation you explained to the

15 parties that it was a civil matter; isn't that

16 correct; whether he had the ability to turn off

17 the lights or --

18 A.    Well, it's illegal for the landlord to just

19 shut off the power or the water.

20 Q.    Isn't that a civil matter?

21              MR. WYNKOOP:  Objection, calls for

22          speculation.

23              THE WITNESS:  I didn't arrest the

24          defendant for turning off the power,

25          Your Honor.

22

1              COMMONWEALTH VS. MOBLEY

2              MR. ELMORE:  Okay.

3 BY MR. ELMORE:

4 Q.    Now it says you spoke to both parties and I

5 assume that you calmed the situation down; is

6 that correct, you and your partner?

7 A.    Correct.

smobley(1)

8  Q.    Now, it says that my client walked, you

9  followed my client into the basement to get some

10  keys; is that correct?

11  A.    Yes.

12  Q.    And than you left the basement; is that

13  correct?

14  A.    Correct, followed him back out.

15  Q.    Okay.  And at no point in time that he

16  left, did he give you permission to reenter that

17  location, did he, sir?

18  A.    No, he was no longer on location.

19  Q.    Okay.  So he was not there.  And you took

20  it upon yourself -- let me ask you this.  Now,

21  you said when you first went down, you said you

22  smelt the marijuana; is that correct?

23  A.    When I first went into the basement?

24  Q.    Yes, when you first went down into the

25  basement?

23

1              COMMONWEALTH VS. MOBLEY

2  A.    Correct, when I went first went down there,

3  Your Honor, I described it as someone had just

4  smoked marijuana.

Page 25



smobley(1)

5   Q.      I'm sorry.  So at that particular point you

6   wanted to conduct an investigation or you wanted

7   to search for marijuana; isn't that correct?

8   A.      No.    To be honest, Your Honor, somebody

9   smoking marijuana, especially to target who

10  smoked, I've never arrested somebody for having

11  smoked marijuana that smelled like it.  No I was

12  trying to finish that situation and I'm trying to

13  leave the location.

14  Q.      All right.  So, officer, you heard of a

15  police radio; is that right?

16  A.      Correct.

17  Q.      You just testified often times you have the

18  ability to secure the location; is that correct,

19  with the police radio, ask for back-up and

20  someone a police officer can stand there and

21  guard the location; isn't that correct?

22  A.      Yea, if we're going to be holding the house



23  for a warrant or if there's like a missing child,

24  yes, there's time that we do need police

25  personnel on location.

24

1           COMMONWEALTH VS. MOBLEY

2   Q.      Now at no point in time did my client ask

3   you to secure his -- secure the basement door,

4   did he, sir?

5   A.      No.

6   Q.      And so you took it upon yourself after you

7   allegedly smelt marijuana to go searching,

8   looking for something to lock, allegedly, the

9   basement door?

10  A.      Correct, Your Honor.  Before he left, there

11  was an agreement between both parties that a lock

12  would be on the door, and they both would each

13  have a key.

14              , With the chair being removed at that

15  point and the defendant no longer being on

16  location, yes, I went down into the basement to

17  find something to secure the door, yes.

18  Q.      You didn't hear anybody screaming down

19  there, or anything of that nature, did you, sir

20  like that, correct?

21  A.      No, Your Honor, my only purpose for going

22  back down there was to find something to secure

23  the door.

24  Q.      You did see in the immediate door area,

25  when you first walk in behind the metal gate,

smobley(1)

25

1          COMMONWEALTH VS. MOBLEY

2  it's like a vestibule right, a little area,

3  correct?

4  A.    Correct.  Yea, there's stairs leading down

5  to a landing, or something like that, yes.

6  Q.    And you didn't see anything immediately

7  right there at this gate or near the door, did

8  you, sir?

9  A.    No, I didn't see anything until I was down

10  the steps.

11  Q.    And then you decided well, I'm going to

12  open this door and go search for an item, right?

13  A.    No, Your Honor.  The second door was open.

14  That was the main concern.  That door wasn't

15  secured at all.

16  Q.    Okay, so --

17  A.    When I went back downstairs that door was

18  still open.

19  Q.    So let me ask you this:  When you looked in

20  the second area, you didn't see anything that you

21  could lock the door; is that right?

22  A.    I didn't find anything, Your Honor.  I was

smobley(1)

23 looking around and in the process of looking is

24 when I discovered everything else, I saw

25 everything else.

♠

26

1                    COMMONWEALTH VS. MOBLEY

2  Q.    As a matter of fact, it's a pretty large

3  basement, correct?

4  A.    I mean it was a decent size.  I don't

5  remember the dimensions of it.

6                    MR. ELMORE:  I have some pictures,

7            Your Honor.

8                    I would ask that they be marked as

9            D-1, D-2 and D-3.

10                   You have a copy.

11                   MR. WYNKOOP:  I do.  I would just

12           ask which ones you're handing up.

13                   (Copies of photographs marked

14           Defense Exhibit D-1 through Defense

15           Exhibit No. 3 for identification.)

16 BY MR. ELMORE:

17 Q.    Officer, let me ask you a question:  The

18 lights were on in the basement; isn't that

19 correct, this was at night, right?

smobley(1)

20  A.    Yes, it was nighttime and if I recall

21  correctly, counselor, I believe there were lights

22  in the rear.  I don't remember.  I remember

23  having the flashlight in the front room.

24  Q.    In the front room?

25  A.    In the front section, correct.

27

1                   COMMONWEALTH VS. MOBLEY

2                   MR. ELMORE:  Okay.  I'm going to ask

3              that we show the officer what's been

4              marked D-1.

5                   THE COURT:  What is D-1?

6                   MR. ELMORE:  D-1 is a picture of the

7              gate area.

8                   I'm going to show it to the officer.

9                   And we'll mark this as D-2.

10                  THE COURT:  What is D-2?

11                  MR. ELMORE:  D-2 is the first

12             initial door that you go into the

13             basement.

14                  D-3 is also a picture of the --

15                  THE COURT:  D-3?

16                  MR. ELMORE:  D-3 is also a picture

smobley(1)

| 17 | of the entryway where the door is that |
| 18 | leads into the basement. |
| 19 | (Pause.) |
| 20 | MR. ELMORE:  Where did I stop, D-3? |
| 21 | THE COURT:  Yes. |
| 22 | MR. ELMORE:  D-4 is when you're |
| 23 | looking when you first walk through the |
| 24 | door that takes you into the basement. |
| 25 | That would be D-4. |

28

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | (Copy of photograph marked Defense |
| 3 | Exhibit D-4 for identification.) |
| 4 | MR. ELMORE:  Your Honor, if I may |
| 5 | approach the witness? |
| 6 | THE COURT:  You may. |
| 7 | THE CRIER:  Exhibits marked D-1 |
| 8 | through  D-4. |
| 9 | MR. WYNKOOP:  Your Honor, I don't |
| 10 | even think I have D-3, so if I could |
| 11 | approach as  well? |
| 12 | THE COURT:  Yes. |
| 13 | BY MR. ELMORE: |

smobley(1)

14 Q.    Officer, I have some pictures that have

15 been marked.  Officer, this is the first metal

16 door, correct?

17 A.    Yes, it looks similar.

18            THE COURT:  Which exhibit is that?

19            MR. ELMORE:  D-1.

20            THE COURT:  D-1.  Thank you.

21 BY MR. ELMORE:

22 Q.    And D-3, is that the area when you first go

23 down the basement steps?

24 A.    This area here is what you referred to as

25 the vestibule.  I think I called it a landing,

29

1            COMMONWEALTH VS. MOBLEY

2 yea.

3 Q.    Okay.

4 A.    That's the stairwell outside of the

5 basement.

6 Q.    And D-2 that would be the door where you

7 come into the basement, right?

8 A.    (No response.)

9 Q.    Do you see the shovels right there?

10 A.    Yea, I mean, yes, Your Honor.  I was only

smobley(1)

11  inside the basement <u>one time</u>, so to the best of

~~False~~

12  my knowledge, yes.

13              THE COURT:  To the best of your

14          recollection?

15              THE WITNESS:  Yes.

16              MR. ELMORE:  Okay.

17              THE COURT:  So D-2 would be the door

18          that goes into the basement?

19              THE WITNESS:  They're all doors that

20          go into the basement.  It seems to me

21          it's the same door from three different

22          perspectives.

23  BY MR. ELMORE:

24  Q.    Now, officer, this would be what you viewed

25  once you looked inside?

↟

                                                    30

1              COMMONWEALTH VS. MOBLEY

2              THE COURT:  Which exhibit?

3              MR. ELMORE:  This is Exhibit D-4.

4  BY MR. ELMORE:

5  Q.    When you looked inside from the doorway,

6  correct?

7  A.    Yes, there's a partition here, and it

smobley(1)

8    looked like drywall.

9    Q.    Now, officer, when you're looking at 1

10   through 4, you didn't see any alleged contraband,

11   did you, sir?

12   A.    No, could you repeat your question?

13   Q.    My question is, you didn't see any

14   contraband, right there when you walked through

15   the door?

16   A.    That is correct.

17   Q.    And you had already previously testified to

18   the smell of marijuana, right?

19   A.    Correct.

20   Q.    When you walked back, it was actually

21   searching -- you can say you were searching for a

22   lock or anything, but you were searching that

23   house, that basement area; is that correct?

24           MR. WYNKOOP:   Objection to

25           searching is a legal conclusion, Your

31

1            COMMONWEALTH VS. MOBLEY

2    Honor.

3            MR. ELMORE:   No, it isn't.

4            THE COURT:   Sustained.

Page 34

smobley(1)

5  BY MR. ELMORE:

6  Q.    You were looking.

7  A.    Your Honor, I wasn't looking for anything

8  illegal, or any contraband.  I was just looking

9  for something to secure the door.

10 Q.    Okay.  And you happened and all this time,

11 you just -- strike that --

12           Now, officer, you said you had the

13 opportunity to talk to my client outside when you

14 were trying to calm down the arguing, correct,

15 landlord/tenant arguing, correct?

16 A.    Yes.

17 Q.    Okay.  Now during the course of that time

18 you took down information you and your partner,

19 isn't that correct?

20 A.    We were separated Your, Honor, and I

21 believe Officer Lee did most of the dealings with

22 -- as far as gathering information.

23 Q.    He was gathering information, ID, phone

24 number I take it, any information that you would

25 normally put on a 75-48?

32

smobley(1)

```
 2  A.     Correct.  That would have been Officer Lee,

 3  I believe I was speaking to the tenants of the

 4  building.

 5  Q.     So at some point Officer Lee felt that he

 6  had retained enough information from this

 7  individual that he told him he could leave if he

 8  wanted to, right?

 9  A.     I can't speculate as to what Officer Lee

10  was feeling.  I wasn't out there with him.  When

11  I went out to speak to Officer Lee again, the

12  defendant was still there.

13  Q.     My client was still there, okay.

14  A.     Yes.

15  Q.     Now, did youretain his phone number or do

16  you recall Officer Lee retaining his cell phone

17  number?

18  A.     I don't recall.

19  Q.     You don't recall.  Now, my client at no

20  point in time asked you to make sure his building

21  was locked and secured, did he, sir?

22  A.     No.

23  Q.     And you said that -- you said that you went

24  back searching back further in the building in

25  the basement.  You said that because you wanted
```

smobley(1)

33

1                 COMMONWEALTH VS. MOBLEY

2   to find a lock of some kind?

3   A.      I was just looking for an object like more

4   of a chain, and Your Honor, as I was just walking

5   through looking in the basement that's when I saw

6   the stuff.

7   Q.      Now, did you or your partner attempt to

8   locate or ask Mr. Mobley if it was okay to secure

9   this room?  You didn't have any conversation with

10  him did you, sir?

11  A.      Your Honor, after it was discovered that a

12  lock had been placed on it, then we -- I thought

13  the defendant and the tenants were under

14  agreement that each would have a key.

15  Q.      At no point in time did anyone offer you a

false → 16  key, did they?

17  A.      No, and I didn't ask for one.  ⚡ False

18  Q.      Okay.  And you took it upon yourself to go

19  in and look for this item without my client's

20  permission?

21  A.      Your client left the location so, yes, I

22  went into look for something to secure the door.

Page 37

smobley(1)

23 Q.     And that was even after you had smelt

24 allegedly marijuana?

25 A.     Correct.  When I first went down in there,

34

1                      COMMONWEALTH VS. MOBLEY

2 Your Honor, I was not aware that somebody had

3 smoked marijuana in the basement.

4 Q.     You were not aware?

5 A.     I wasn't concerned that somebody had smoked

6 marijuana in the basement, no.

7 Q.     Okay.  And you now -- let me ask you this:

8 When you say you walked back into the basement,

9 did the smell of marijuana get stronger or less?

10 A.     After I had seen all the stuff in the back,

11 yes, that's when I approached that, yea, the

12 smell did grow stronger, yes.

13 Q.     So at that point in time, you felt that --

14 you didn't stop and say, I need a warrant or did

15 you keep searching the basement to find the

16 marijuana?

17 A.     No, I didn't search the basement.  I saw

18 all the stuff on top of the desk and I saw the

19 bag there, and as I started walking back, that's

smobley(1)

20 when I could see like the top of the bag with, it

21 looked like bulk marijuana.

22 Q.    Well, you observed the desk and you said

23 that you saw some plastic baggies, isn't that

24 right, on the desk?

25 A.    Yea, it looked like a bulk amount of little

♠

35

1                    COMMONWEALTH VS. MOBLEY

2 Ziploc baggies.

3 Q.    They were Ziploc or sandwich baggies?

4 A.    No, they weren't sandwich bags.  I don't

5 recall seeing them.  It's more what's commonly

6 used, like nickel or dime bags for marijuana.

7 Q.    Well, do you remember testifying on April

8 7th, 2016, at the preliminary hearing.

9                    THE COURT:  Counsel, please mark for

10              identification.

11                    MR. ELMORE:  This was the notes of

12              testimony.

13                    (Notes of testimony marked Defense

14              Exhibit D-5 for identification.)

15                    THE COURT:  D-5?

16                    MR. ELMORE:  D-5.

smobley(1)

17              THE WITNESS:  Yes.

18              THE COURT:  The date, please?

19              MR. ELMORE:  That was on April 7th,

20         2016.

21              THE COURT:  The preliminary hearing?

22              MR. ELMORE:  The preliminary

23         hearing, yes.

24    BY MR. ELMORE:

25    Q.    And it's on Page 6, Line 12.

36

1                   COMMONWEALTH VS. MOBLEY

2                   It says, "What if anything did you

3    see in the basement?

4                   ANSWER:  I did see packaging

5    material.  Looked like empty -- sandwich --

6    sandwich baggies on the top of the desk."

7                   And now today you come into the

8    courtroom and say you don't recall any sandwich

9    baggies, is that your testimony?

10   A.    That's correct.  All I remember, they were

11   the Ziploc bags.

12   Q.    So this would have been closer to the date?

13   A.    Correct, Your Honor.  I could have

smobley(1)

14  misspoken, but what I recall seeing was the

15  Ziploc bags.

16  Q.    But what you said in here is "sandwich."

17  You believe now you had misspoken?

18  A.    Yes.

19  Q.    Well, what you saw was sandwich baggies,

20  you saw sandwich baggies; isn't that right?

21           MR. WYNKOOP:  Objection, asked

22           and answered.

23           THE COURT:  Sustained.

24           MR. ELMORE:  I have no further

25           questions at this point.


37

1              COMMONWEALTH VS. MOBLEY

2              THE COURT:  Any redirect?

3              MR. WYNKOOP:  Briefly, Your Honor.

4              THE COURT:  Yes.

5              MR. WYNKOOP:  Thank you.

6                    -  -  -

7              REDIRECT EXAMINATION

8                    -  -  -

9  BY MR. WYNKOOP:

10  Q.    When the defendant leaves the basement for

smobley(1)

11  the first time, after he finds his keys, you

12  mentioned that he had left in a hurry.  Did you

13  hurry out with the defendant?

14  A.      No.

15  Q.      Where were you when the defendant left?

16  A.      I believe I was still right outside the

17  gate talking to the tenants.

18  Q.      When the defendant left did he ever say

19  anything in any way to exit his basement?

20  A.      In regards to me?

21  Q.      Yea, did he say anything to you when he

22  left?

23  A.      No.  When --

24  Q.      You testified on direct and cross

25  examination he left in a hurry.  When he left did

                                                        38

1                COMMONWEALTH VS. MOBLEY

2  he say, get out of my basement?

3                MR. ELMORE:  Objection, Your Honor,

4            to the question.

5            He never said -- that's a

6            mischaracterization.  He wasn't in the    Inconsistency

7            basement when he left.

                    Page 42

smobley(1)

| 8 | THE COURT:  Well, he asked the |
|---|---|

9        question, he said no, and he was going

10        to make a point.

11            MR. ELMORE:  Okay.

12            THE COURT:  You can continue.

13  A.    When he -- when I saw him apparently

14  walking off in the front, I was under the

15  understanding he was going to wait there for the

16  key.

17            THE COURT:  Before you go I want to

18        ask you.

19            It's my understanding that after

20        he found the keys in the basement he

21        came outside and there was a discussion

22        between you, he and the tenant, and

23        that there was an agreement that the

24        chain and lock would get put back on

25        and each would get a key.  Is

39

1            COMMONWEALTH VS. MOBLEY

2        that how that worked?

3            THE WITNESS:  Yes, I think that

4        agreement was made before we went into

Page 43

smobley(1)

| | |
|---|---|
| 5 | the basement, though, Your Honor.  I |
| 6 | think it was locked and then it was |
| 7 | unlocked, and I think that's when they |
| 8 | made the agreement that each would have |
| 9 | a key.  I don't think it was like |
| 10 | after. |
| 11 | THE COURT:  And then he came out of |
| 12 | the basement and the defendant was gone |
| 13 | and he took the chain with him? |
| 14 | I'm trying to get my timing and |
| 15 | sequence down. |
| 16 | THE WITNESS:  I didn't notice when |
| 17 | the chain was taken at that point.  I |
| 18 | just know that he was supposed to get a |
| 19 | key, the tenant was supposed to keep |
| 20 | the key, and he was just walking out |
| 21 | front waiting for the key, and then |
| 22 | when we went to resecure the door, the |
| 23 | chain wasn't there.  So, I don't know |
| 24 | at what point in time, I don't know if |
| 25 | it was when the key was unlocked or |

40

1                  COMMONWEALTH VS. MOBLEY

Page 44

smobley(1)

2              when we left, that he might have

3              grabbed it.

4                   All I know is -- after I -- the very

5              next time I saw the defendant he was

6              walking southbound on 63rd Street,

7              returning to the building with that

8              chain in his hand.

9    BY MR. WYNKOOP:

10   Q.      So when the defendant leaves then, officer,

11   are you still in the basement?

12   A.      No, I was outside.

13   Q.      Okay.  Now, the baggies that you see laid

14   out on top of the desk, irrespective of what we

15   call sandwich or Ziploc, did you recognize those

16   baggies to be for a purpose familiar with your

17   training and experience?

18   A.      Correct, especially coupled with the fact

19   that there was a digital scale there.

20   Q.      And what purpose through your training and

21   experience did you believe those baggies served?

22   A.      Especially because of the smell of the

23   marijuana, I assumed it was to package marijuana.

24                   MR. WYNKOOP:  I have nothing

25              further, Your Honor.

Page 45

smobley(1)

41

1          COMMONWEALTH VS. MOBLEY

2          THE COURT:  Anything else, based on

3             that?

4          MR. ELMORE:  No, I have nothing

5          further, Your Honor.

6          THE COURT:  Thank you, officer.

7          THE WITNESS:  May I be excused?

8          THE COURT:  You may.

9          THE WITNESS:  Thank you.

10         MR. WYNKOOP:  Your Honor, for the

11         limited purpose of the motion to

12         suppress, only, the Commonwealth would

13         rest.

14         THE COURT:  Defense?

15         MR. ELMORE:  Your Honor, I would

16         move the exhibits in, and I would rest.

17         THE COURT:  May I have the exhibits?

18         MR. WYNKOOP:  And, for the record,

19         the Commonwealth has no objection to

20         D-1 through D-5.

21         THE COURT:  All right.  Defense?

22         MR. ELMORE:  Your Honor, I would ask

smobley(1)

23          the Court to grant this motion, based

24          on the fact that there's no permission

25          -- there's no permission and there's no

42

1          COMMONWEALTH VS. MOBLEY

2          exigent circumstances.

3               Now, the testimony is this occurred

4          after he allegedly smelled marijuana.

5          Now the last I checked marijuana was

6          illegal, even though I don't think it

7          should be, but it is.

8               The real issue is, if I decided that

9          these police officers have the ability

10          to secure a building or anything

11          because they don't want to leave it

12          open, they decided, Judge, well, that

13          would be a great excuse if something

14          goes on on the front porch, well, this

15          door is unlocked, well, I have the

16          responsibility.  That's why they have

17          -- that's why they secure buildings

18          because you don't have a right to go

19          past that threshold.  You don't,

smobley(1)

| 20 | without a warrant.  We hold that very |
| 21 | sacred in this country. |
| 22 | He didn't have permission to go |
| 23 | inside.  He can go in there and search |
| 24 | and talking about plain view, you only |
| 25 | have plain view if you're legally where |

43

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | you're supposed to be at.  He's not |
| 3 | legally, without anybody's permission, |
| 4 | inside this basement of the building |
| 5 | owned by this individual. |
| 6 | He simply don't have permission. |
| 7 | There's no exigent circumstances.  The |
| 8 | only way we can get beyond the |
| 9 | permission is that you have to have |
| 10 | exigent circumstances. |
| 11 | Now, in this situation does he say, |
| 12 | well, I heard people down there |
| 13 | possibly destroying evidence?  No.  Do |
| 14 | I have a situation where a person is |
| 15 | hearing something, someone being in |
| 16 | danger?  No. |

Page 48

smobley(1)

| 17 | He had other means to protect that |
| 18 | location.  He decided not to use it. |
| 19 | And it's strange to me that he never |
| 20 | found -- he looked in there -- maybe |
| 21 | somebody's trying to just look in the |
| 22 | door and see if there's something |
| 23 | there.   There's nothing's there.  So |
| 24 | what do you do? |
| 25 | We have to secure, let me check with |

44

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | my partner if he got his phone number |
| 3 | his cell phone.  I'll call this guy and |
| 4 | tell him, hey the situation here, you |
| 5 | need to come back and lock your door, |
| 6 | or I would ask that we send a detail, a |
| 7 | back-up detail, to secure this location |
| 8 | so no one can enter or leave until we |
| 9 | reach the owner, until it's secured, we |
| 10 | come back. |
| 11 | That's a lot less intrusive, or |
| 12 | someone violating someone's privacy of |
| 13 | going inside the house.  Just think |

smobley(1)

| 14 | about it.  There's a situation on the |
| 15 | porch, and somebody says, oh, I'm going |
| 16 | to go inside this house and search |
| 17 | around and see if I can find an extra |
| 18 | key. |
| 19 | It doesn't work like that.  Not if |
| 20 | you're law enforcement.  Let's see if |
| 21 | we can reach the owner.  Until that |
| 22 | time, we need to secure the house. |
| 23 | It's not an apartment.  This is a |
| 24 | house.  It's a private building.  You |
| 25 | simply do not go rambling through |

45

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | someone's private building looking for |
| 3 | something that's not -- I could see |
| 4 | maybe if someone had gotten shot |
| 5 | outside the building and there were |
| 6 | exigent circumstances.  I got to go |
| 7 | inside here to find something to |
| 8 | bandage this individual, you know.  I |
| 9 | need a tourniquet or something.  I got |
| 10 | to have something right away, you know, |

smobley(1)

| 11 | then they go inside, they look and they |

12          go in to grab something and then they

13          see something.

14              Where's the exigent circumstances.

15          There are none.  And therefore, Judge,

16          I would ask you to grant this motion

17          under the United States Constitution

18          and the Pennsylvania; the right to

19          privacy.  This man here did not give

20          him permission to reenter this basement

21          and my client had already left.

22              THE COURT:  Thank you.

23              MR. WYNKOOP:  May I, your Honor?

24              THE COURT:  You may.

25              MR. WYNKOOP:  Thank you.

46

1          COMMONWEALTH VS. MOBLEY

2              Your Honor, my argument is in two

3          prongs.

4              First, based on counsel's argument,

5          constitutional protection, the Court is

6          well aware, said, particularly to

7          search, particularly to enter does not

smobley(1)

8          have to be verbally spoken.  There's

9          both verbal and non-verbal

10         communication.

11             What I think Your Honor heard today

12         was very fairly lengthy criminal

13         testimony from Officer Farley exactly

14         how he got into that basement on that

15         day.

16             He arrives with his partner to calm

17         down a landlord/tenant dispute.  In the

18         capacity of calming that down, they

19         reach an agreement with one of the

20         tenants, they reach an agreement with

21         the landlord; they're each going to get

22         a key for this lot, securing this

23         basement which as Your Honor will

24         notice from D-1 is entered from outside

25         of the property.  They're both going to

47

1          COMMONWEALTH VS. MOBLEY

2          get a key.  Great.  The defendant says

3          to Officer Farley, I gotta' get my key

4          out of there, so I got to get in there.

smobley(1)

```
5            Great.

6                  They walk into the basement together

7            talking about landlord/tenant disputes,

8            possible legality of turning off the

9            electric on your tenant, they're having

10           a conversation that at no point is

11           coercive, that at no point is coercive,

12           at not point is indicative of custody.

13           They're having what I would describe,

14           Your Honor, for all intense and

15           purposes of the situation a friendly

16           conversation about what the defendant

17           can and cannot do to his tenants, and

18           they arrive in the basement.  At that

19           point the defendant does not turn

20           around and say, get out of my basement.

21           I don't give you permission to be here.

22                  At that point it's actually Officer

23           Farley that starts looking for the keys

24           with the defendant.

25                  Mr. Elmore's point that at that
```

48

```
1            COMMONWEALTH VS. MOBLEY
```

Page 53

smobley(1)

| | |
|---|---|
| 2 | point Officer Farley is smelling |
| 3 | marijuana.  Apparently someone smoked |
| 4 | marijuana down there.  It's burnt |
| 5 | marijuana.  He wasn't going to find it. |
| 6 | All he wanted to do was help the |
| 7 | defendant find his keys, and secure the |
| 8 | door, because at this point Your Honor, |
| 9 | this start of it, 10:30 at night, it |
| 10 | had to be approaching 11:00, if not |
| 11 | later, and the defendant disappears on |
| 12 | Officer Farley. |
| 13 | Not only that, Officer Farley |
| 14 | notices that the chain that had secured |
| 15 | this door, which was needing to be |
| 16 | resecured at 11:00 at night was gone. |
| 17 | So rather than up and leave the |
| 18 | area, rather than leave the defendant's |
| 19 | door wide open, to what he describes as |
| 20 | his office, to what controls the |
| 21 | electrical control panel for the entire |
| 22 | building, rather than do that, Officer |
| 23 | Farley was just looking for the chain |
| 24 | that had initially secured it, that the |
| 25 | landlord tenant now had a key to. |

Page 54

smobley(1)

49

| | |
|---|---|
| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | At no point did the defendant -- is |
| 3 | there any testimony that the defendant |
| 4 | withdraws consent; that he says get out |
| 5 | of my basement and at this point we |
| 6 | have conduct, non-verbal conduct that |
| 7 | tells us the defendant had no problem |
| 8 | with Officer Farley being in his |
| 9 | basement. |
| 10 | That I believe is the constitutional |
| 11 | argument that rebuts counsel's |
| 12 | argument, Your Honor, that there's |
| 13 | permission given; that that consent was |
| 14 | not withdrawn that the defendant had |
| 15 | the opportunity to withdraw that |
| 16 | consent and didn't; and, therefore, |
| 17 | Officer Farley viewed the paraphernalia |
| 18 | and marijuana from a legal vantage |
| 19 | point thereby it was within the |
| 20 | Constitution both the United States and |
| 21 | Pennsylvania. |
| 22 | The second prong, Your Honor, I |

smobley(1)

| | |
|---|---|
| 23 | don't really believe that we reached a |
| 24 | constitutional trigger here, and I |
| 25 | would incorporate my argument from |

50

| | |
|---|---|
| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | Prong I, and I would ask Your Honor to |
| 3 | just consider the testimony of Officer |
| 4 | Farley.  He wasn't looking for |
| 5 | contraband.  He's not down there |
| 6 | looking for anything.  In fact this is |
| 7 | Officer Farley taking a step back from |
| 8 | arresting people, one of the things |
| 9 | that police officers do, to helping and |
| 10 | aiding in the community.  And I think |
| 11 | throughout his testimony we have |
| 12 | examples of him trying to help the |
| 13 | community; not lock anybody up, not |
| 14 | search for contraband, not jam up the |
| 15 | defendant and find contraband in his |
| 16 | basement, he's trying to help. |
| 17 | I don't believe that at any point |
| 18 | here, anything that he does either on |
| 19 | the premises or to the defendant |

smobley(1)

| 20 | triggers the Constitution.  Because |
| 21 | there's no Constitutional triggers this |
| 22 | motion is not ripe. |
| 23 | I think everything that Officer |
| 24 | Farley did while he was within the |
| 25 | confines of the Constitution are legal |

51

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | and doesn't trigger the Constitution. |
| 3 | Officer Farley was trying to help |
| 4 | this man.  While doing that he |
| 5 | discovered what he believed to be bulk |
| 6 | marijuana through his training and |
| 7 | experience, from a legal vantage point, |
| 8 | and while we're talking about |
| 9 | constitutional triggers, Officer Farley |
| 10 | again credibly testifies as soon as I |
| 11 | saw the scale and the bulk marijuana I |
| 12 | stopped, I left. |
| 13 | It's at that point he's gone from |
| 14 | aiding the community to his other role |
| 15 | as a police officer which is |
| 16 | investigating what he believes to be a |

smobley(1)

| 17 | crime.  And he takes those clear and |
| 18 | articulable facts he gives them to his |
| 19 | supervisor, they give them to |
| 20 | Philadelphia detectives and a search |
| 21 | warrant is legally obtained. |
| 22 | At that point a search warrant is |
| 23 | executed, but at no point is the |
| 24 | constitution violated and I don't |
| 25 | believe at any point do I think the |

52

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | Constitution was triggered and I'd ask |
| 3 | Your Honor to deny the motion to |
| 4 | suppress. |
| 5 | THE COURT:  Thank you. |
| 6 | It's an interesting issue, but |
| 7 | these are certainly fact specific; the |
| 8 | officer arrives on the scene and |
| 9 | there's some type of argument between |
| 10 | the landlord and the tenant, and |
| 11 | they're trying to get it resolved.  And |
| 12 | it seems that part of the resolution |
| 13 | was that the chain and padlock would be |

smobley(1)

| 14 | replaced on the door and each one would |
| 15 | have a key. |
| 16 | When the defendant first initially |
| 17 | said he had to get a key before he |
| 18 | wanted to leave, he couldn't find it |
| 19 | and the officer accompanied him in the |
| 20 | basement without protection. |
| 21 | So then when they come back out to |
| 22 | close the deal, so to speak, to put the |
| 23 | chain and the padlock back on the door |
| 24 | the defendant's missing, and so is the |
| 25 | chain, but the door's wide open. |

53

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | So the officer has no idea as to |
| 3 | whether the chain was taken, was |
| 4 | inside, was outside.  If the officer |
| 5 | leaves and leaves the door wide open |
| 6 | and all kinds of damage happens, then |
| 7 | you're going to hear hell.  But the |
| 8 | door was open the door was never |
| 9 | secured and the officer credibly |
| 10 | testified that he just went there to |

smobley(1)

| 11 | see if the chain was there so he could |
| 12 | fasten the door because he knew the |
| 13 | landlord had a key, and in that, |
| 14 | looking for that chain, which was |
| 15 | agreed upon was when he noticed the |
| 16 | thing on the defendant's desk and then |
| 17 | the bulk marijuana. |
| 18 | I don't see that the constitutional |
| 19 | protections of entering into someone's |
| 20 | home in this particular case, given all |
| 21 | of the facts and circumstances, and the |
| 22 | interchange between this defendant and |
| 23 | this officer, and what was happening in |
| 24 | the agreements that were made, tried to |
| 25 | keep the peace, that the officer made |

54

| 1 | COMMONWEALTH VS. MOBLEY |
| 2 | an entry without permission or lack |
| 3 | thereof, and for those reasons I will |
| 4 | deny the motion to suppress. |
| 5 | MR. WYNKOOP:  And, Your Honor, I |
| 6 | will be ready to proceed to trial.  I |
| 7 | just need to wrangle my detective and |

smobley(1)

| 8  | my chemist.                             |
|----|-----------------------------------------|

9         (Pause.)

10        MR. WYNKOOP: Your Honor, with the

11        Court's permission there were two

12        detectives that were present that day.

13        (Pause.)

14        MR. ELMORE: This is the detective

15        who did what?

16        MR. WYNKOOP: Who did the search.

17        It's on the paperwork. The two of them

18        executed the search together.

19        THE COURT: If you think you need

20        the other officer, I'll give this a

21        date.

22        MR. ELMORE: No, we don't want a

23        date.

24        THE COURT: Okay.

25        MR. WYNKOOP: So I could just let

55

1         COMMONWEALTH VS. MOBLEY

2         the detective look over the paperwork

3         and the property receipts --

4         THE COURT: Sure.

smobley(1)

5          MR. WYNKOOP:  -- and I'll call him

6      to testify.

7          (Pause.)

8          MR. ELMORE:  Your Honor, we have not

9      colloquyed my client and I just got to

10     talking to my client, and he's going to

11     demand a jury.

12         He called me in the back.

13         MR. WYNKOOP:  May I release

14     everybody?

15         THE COURT:  You may.

16                 -  -  -

17         (Motion to suppress concluded.)

18

19

20

21

22

23

24

25

56

1

smobley(1)

2           C E R T I F I C A T I O N

3

4

5                I hereby certify that the

6            proceedings and evidence are contained

7            fully and accurately in the notes taken

8            by me on the matter of the above cause,

9            and this copy is a correct transcript

10           of same.

11

12           _____
             KIM TOWARNICKI
13           Official Court Reporter

14

15                (THE FOREGOING CERTIFICATION OF THIS

16           TRANSCRIPT DOES NOT APPLY TO ANY

17           REPRODUCTION OF THE SAME BY ANY MEANS,

18           UNLESS UNDER THE DIRECT CONTROL AND/OR

19           SUPERVISION OF THE CERTIFYING

20           REPORTER.)

21

22

23

24

25