Exhibit - F

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

\- - -

COMMONWEALTH :
vs. :
SHAWN MOBLEY :CP-51-CR-0003485-2016

\- - -

April 28, 2017
Courtroom 704, Criminal Justice Center
Philadelphia, Pennsylvania

\- - -

MOTION RECONSIDERATION

\- - -

BEFORE: THE HONORABLE VINCENT MELCHIORRE, J.

APPEARANCES:

ZACHARY WYNKOOP, ESQUIRE
Assistant District Attorney
For the Commonwealth

BERTO ELMORE, ESQUIRE
Counsel for the Defendant

♀

COMMONWEALTH VS. MOBLEY

MR. ELMORE: Good morning, Judge.

THE COURT: Good morning.

All right. We're here on Case No. 1, Shawn Mobley. Mr. Elmore is here for the defense, and Zach Wynkoop for the Commonwealth.

This is defense's motion for reconsideration filed, based on the motion to suppress and that was heard in this courtroom on April 3rd, 2017.

MR. WYNKOOP: That's correct, Your Honor.

THE COURT: Mr. Elmore, you may proceed.

MR. ELMORE: Judge, I filed this motion because I felt this Court had erred on the law based on the facts.

As the Court knows, and I have presented two cases or three cases. I know the Court has read those.

I think that what we have here is, well, these cases talk about -- one of the first things I want to talk about,

Judge, is the law. And the two cases presented are Supreme Court cases Commonwealth vs. Roland, and Commonwealth vs. Melendez.

Now I tried to find cases that I think are similar to our situation as possible, and that was with Commonwealth vs. Roe which is a Superior Court case, and I talk about an open door and I also talk about finding an item --

THE COURT: Mr. Elmore, remember,

that was a stormy night.

MR. ELMORE: Yes, the door was open --

THE COURT: Right.

MR. ELMORE: -- and they walked in.

THE COURT: Right.

MR. ELMORE: And in that situation the Superior Court said, that was not enough.

THE COURT: Exactly. And I would agree with the Superior Court.

COMMONWEALTH VS. MOBLEY

MR. ELMORE: And in this particular situation we have some prior communications between my client and the police officers. I think that it is clear that they did two things.

The record reflects that the officer said they -- on Page -- I have the page here, Page 14.

THE COURT: What line?

MR. ELMORE: Line 2, Judge.

THE COURT: Okay.

MR. ELMORE: It says, "So at that point the door was unlocked. I went back into the basement with the defendant along with Officer Lee. When I went down into the basement I smelled what I believed to be burnt marijuana."

THE COURT: You're on page?

MR. ELMORE: I don't know. Do you all have the same thing?

THE COURT: I have on the bottom of Page 14 --

MR. ELMORE: That's how I went

through it. I was at the bottom of the page.

I don't know. Do you have the same page I have?

THE COURT: Page 14 on the very bottom?

MR. ELMORE: Yes.

THE COURT: Go ahead.

MR. WYNKOOP: So on the bottom of Page 13, Your Honor.

MR. ELMORE: Yes.

THE COURT: Okay.

MR. ELMORE: "So at that point the door was unlocked. I went back into the basement with the defendant along with Officer Lee. When I went down into the basement I smelled what I believed to be burnt marijuana."

And on Page 14, it says, "After smelling the burnt marijuana in the basement does the defendant remain in the basement? "

"Yes. He was looking around for, he

said his keys. Your Honor, I remember when I went down, on the right-hand side, there was, it looked like shelving there, was a set of keys hanging. I did notice the defendant walked by them and not grab them -- this is the answer -- he seemed to be pacing back and forth."

"He stated to me -- he stated to me that he thought the tenants stole his keys, and I told him that I didn't believe that happened because I hadn't seen anyone go to the basement, and I pointed out, I said, "Are those your keys right there?" And just real quick he said "Oh, yeah, they're mine," and we exited the basement."

And then on Page 15, the officer stated -- I got a page out of place here.

It says: "QUESTION: Okay, what were you looking for down there, when you returned to the basement?

Just something to secure the door. Because it looked like he, you know, being the landlord, I was kind of hoping to find something to secure the door with."

And then if you go further down it says, "I went back into the basement, Your Honor, I started noticing more so than the burnt marijuana smell, I started smelling unburnt marijuana."

Now, Judge, this is somebody that, "I started smelling." He's a police officer, so to say the fact that he's smelling this marijuana and he's walking around the basement, the last I checked it was illegal.

And then it says "I was walking just looking for something to secure the door. I noticed in the back in the other part of the basement, there was a desk and I saw unused packaging."

So he's looking all the way in the back of the basement, looking for

something to secure this door. That's looking. That's searching.

So under what authority does he have a right to go into a private area and search?

And then, Judge, we talk about probable cause. Probable cause arises if there is, in fact, a crime.

I think that at the most, basically he's saying, there's no crime here, he's saying it's not a crime, but he's

saying just ignore that, I didn't care about that. But do you have a right to go in someone's house and search when there's no crime, there's no probable cause?

So, Judge, at this point -- and I believe Melendez says, police can't create exigent circumstances. So it's easy to say that the crime had taken place and I had probable cause, probable cause is here but there's no crime, then there's no probable cause.

So we move forward to exigent circumstances.

Now, both Melendez and in particular, Roland, talks about exigent circumstances. And in Roland it says it's private if there is a presumptive unreasonableness to go in somewhere private without a warrant; that's the first thing.

The second thing, Judge, is that they talk about a list of factors, and Commonwealth vs. Roland, in terms of reasonableness, you got to have probable cause and you got to have exigent circumstances, and the factors they talk about, among the factors, the gravity of the offense, whether we have

an offense here in this case, yes or no?

THE COURT: Can I see those?

MR. ELMORE: Yes. And I don't see those here. I don't see a crime here. You don't have any permission by the

client and he testified that in the notes that, he testified:

"Did he give you permission to go into the basement? No."

"Did he ask you to lock the door? No."

This is a government action. This is not a neighbor. That's why we have the amendment to protect citizens against the government. So a government actor, you just can't walk in and say, I'm going to go over to this guy's house and I'm going to roll into this guy's house, and I'm going to lock his door?

Did he tell you to lock the door? No. So what are you doing walking around his basement, walking around in his private residence? It's clear in the notes of testimony that he did not have permission.

And it's clear that he went in there to lock a door. What was he going to

lock it with? He didn't have a key.

Is it reasonable to suggest, well, he's going to find something in somebody's house to lock the door? He also could have gotten the keys from -- he knew that my client wasn't there?

We can not take away a person's privacy rights because a police officer says, well, I decide I want to lock a door. That's not exigent circumstances under any situation.

If they wanted to protect the situation they could have did it with less intrusive way; waited to contact my partner, to see if he had his phone number to see if he came back, but you can't just open the door and start searching and in the notes of testimony, he said he was looking and there was an objection; he was searching. Looking, searching they're basically the same thing. He was conducting a search. He was looking

for something.

Judge, I don't see how the law protects this issue in terms of there

is no probable cause and there's no exigent circumstances, and you have to have both. There's certainly no exigent circumstances to go inside a house to lock a door.

In Melendez very clearly, the holding in Melendez is the police can not create exigent circumstances.

So, I don't know whether exigent circumstances -- I asked him very clearly and the notes say I asked was anybody screaming --

THE COURT: I understand, counsel. I got it.

MR. ELMORE: All right.

THE COURT: I got it.

MR. ELMORE: Judge, I think that I'm correct -- the two cases I gave to the Court and Commonwealth vs. Roe, I think they're all on point, and I would ask

the Court to reconsider and grant the motion to suppress.

THE COURT: Commonwealth, do you have anything additional?

MR. WYNKOOP: I have argument based on counsel's case law.

THE COURT: Okay.

MR. WYNKOOP: Just briefly, Your Honor, I just want to put my three

points on the record.

THE COURT: Go ahead.

MR. WYNKOOP: I think the first one I'd like to put on the record for submission is that the case law here is not at all analogous with the situation we're dealing with.

I would agree with counsel that the exigent prong laid out in both Roland and Roe are correct and the Court ruled correctly there; but these cases are not analogous to what we have here.

Just mostly what I want to hit on is Mr. Elmore's assertion that looking for

something and searching are basically the same thing.

In this courtroom and every courtroom in this building they are a hundred percent not the same thing. Searching is a legal term of art. A search is something a police officer will perform in the hopes of finding contraband, weapons, narcotics, et cetera, and so forth.

Looking for, on the other hand, Officer Farley, he was returning to the house where a landlord tenant dispute had just occurred, where both parties had agreed to padlock the door with a

chain and a lock that both parties had had a key to, and after that agreement, this gentleman right here disappeared and so did the chain.

Officer Farley took it upon himself, rather than 11:00 at night leaving the basement door wide open, rather than doing that, Officer Farley served the

community, and entered the basement that he had already been given permission to go in to, to see if he could find that chain and locks so Mr. Mobley's personal property is not destroyed.

And lastly, Your Honor, exigent circumstances to search, as soon as he sees the unburnt large quantities of marijuana, Officer Farley, he does not continue looking.

So Officer Farley did not go in the basement for a search, that's a legal term of art, but rather went into the basement to help the defendant.

So for those three reasons I would ask Your Honor to deny the motion for reconsideration.

THE COURT: Thank you.

All right. I have read all three cases and I agree that in this

particular case, there isn't reasonable suspicion, there isn't probable cause,

or exigent circumstances but that's not the facts of this case.

The facts of this case is the officer responds to the dispute and as a resolve of that dispute he has a key to enter the basement. The landlord and the tenant give him permission to go in the basement.

The landlord actually invited the officer in, on the first go around. There's a padlock and there's a chain.

After that agreement, the door was left open, the police officer was outside with the tenant and the defendant disappears. The tenant has permission to be in the basement as well as the landlord.

The landlord never revoked his permission. Permission trumps reasonable probable cause and exigent circumstances. The owner never revoked. The tenant had a right to give permission if there's an agreement

that a chain and a lock would be on it, both people would have keys, that was

never resolved, so that was never revoked.

I've read all three of the cases, Roe, Roland and Melendez, and they are totally factually different from this case. Which there is nothing similar to those three instances where the police, on their own, decide to enter a property with no dialogue of the owner except for the underage drinking case.

And in this case permission was given by the owner and he also had the right to give permission, the door was left open, the chain was missing. The officer went in to look for the chain, not to search the property.

For that reason I will deny the motion for reconsideration; and the motion to suppress is denied.

Thank you.

(Pause.)

MR. ELMORE: Judge, my client wants to waive and we're asking for a recusal to go in front of another judge.

THE COURT: Sure, in an abundance of caution.

It's going to be a waiver?

MR. ELMORE: Yes. It's going to be a waiver, Your Honor.

THE COURT: Well, let's, while he's here, let's do the waiver colloquy and then I'll send it to another room on another date.

Do you have the waiver colloquy form filled out, Mr. Elmore?

MR. ELMORE: Yes.

(Pause.)

THE COURT: Okay. Good morning again, Mr. Mobley.

THE DEFENDANT: Good morning.

THE COURT: Is he sworn?

THE CRIER: Let me do that, Judge.

Sir, please state your name and spell it for the Court.

THE COURT: Pull that mic closer to you.

THE DEFENDANT: Shawn Mobley, S-h-a-w-n, M-o-b-l-e-y.

THE COURT: Good morning, Mr. Mobley.

As you are aware, I have denied the motion to suppress and the motion for reconsideration, and after those two things were done I had asked your attorney whether you wanted to proceed to a jury trial or a waiver trial. And your attorney represented to me that you would like to go to a waiver trial.

However, you've asked me to recuse myself, take myself off this case, now that I've heard so much about it, and I granted that motion, for a waiver trial.

And so what we're going to do now, I'm going to colloquy you on your right to waive your right to a jury trial and then we will send you to another waiver

room to a judge who knows nothing about this case for your trial.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You agree with everything with the recitation of the facts as I've laid them out as it relates to this colloquy?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Very good. Okay. So before I can accept your waiver of your jury trial rights, I am required by law to ask you certain questions to make sure that you understand that you have the absolute right to a jury trial, and that right is guaranteed to you by United States and Pennsylvania Constitutions.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So, sir, how old are you?

THE DEFENDANT: Thirty-eight, back

when this --

THE COURT: Actually, pull that microphone closer to you.

How far did you go in school?

THE DEFENDANT: Three years of college.

THE COURT: Can you read, write and understand the English language?

THE DEFENDANT: Yes, I can.

THE COURT: Have you ever been or are you currently being treated for any mental illness?

THE DEFENDANT: Yes.

THE COURT: Would that condition or any medication you may be on as a result of that condition affect your ability to understand what's going on here today?

THE DEFENDANT: No.

THE COURT: Are you under the influence of any drugs, alcohol or prescription medication that would affect your ability to understand

what's happening here today?

THE DEFENDANT: No.

THE COURT: All right, sir. I am showing you what's called a waiver of your jury trial rights form.

Have you reviewed this form with your attorney?

THE DEFENDANT: Yes.

THE COURT: As I have advised you at the beginning of this colloquy is you have an absolute right to a jury trial as guaranteed to you by both the United States and Pennsylvania Constitutions.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. With this form you give up your right to that jury trial, and at the bottom left-hand side of this form, is that your signature?

THE DEFENDANT: Yes.

THE COURT: Did you waive your right to a jury trial of your own free will?

THE DEFENDANT: Yes.

THE COURT: Are you completely satisfied with your attorney to this point?

THE DEFENDANT: Yes.

THE COURT: I must advise you that if you wanted a jury trial, the jury

would consist of 12 citizens from the community. You would be able to participate with your attorney in selecting that 12-member jury. The jury would then listen to the facts of the case and decide whether you were guilty or not guilty of the charges against you.

If the jury decided that you were guilty, that verdict would have to be unanimous; that is all 12 jurors would have to agree.

Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: According to the form that you have read and discussed and signed with your attorney, you're

agreeing to give up your right to a jury trial and allowing the judge alone to listen to the facts of the case and decide whether you are guilty or not guilty of the charges against you.

Do you understand that that is the form you have signed?

THE DEFENDANT: Yes.

THE COURT: And do you agree to have this case heard by me today alone without a jury?

THE DEFENDANT: Yes.

THE COURT: Has anyone promised you anything in exchange for your waiver of your right to a jury trial?

THE DEFENDANT: No.

THE COURT: Have any threats been made to you to get you to give up your right to a jury trial?

THE DEFENDANT: No.

THE COURT: All right. I am satisfied that the defendant is making a knowing, intelligent and voluntary

waiver of his right to a jury trial, and I will accept the same.

We will wait until this is assigned to another judge and then you can enter the plea.

THE CRIER: 5/19.

THE COURT: 5/19, 704.

THE CRIER: 804. I'm sorry.

\- - -

(Reconsideration hearing concluded.)

\- - -

C E R T I F I C A T I O N

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the matter of the above cause, and this copy is a correct transcript of same.

______________________
KIM TOWARNICKI
Official Court Reporter

(THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS, UNLESS UNDER THE DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING REPORTER.)

Exhibit G

# Ream 1 of 2

**500 (1 to 500) of 791 pages**

Civil Action No. 18-924

## Request #16045126

## OLUTOKUNBO EFUNNUGA

MRO
1000 Madison Avenue
Suite 100
Norristown, PA 19403

Sheree Mobley-Bradham
Personal
537 Orchard Ave.
Yeadon, PA  19050



Shipment #10084348
OLUTOKUNBO EFUNNUGA
Invoice #16045126
791 pages

MRO
1000 Madison Avenue
Suite 100
Norristown, PA 19403
Ph: (610) 994-7500
Fx: (610) 962-8421

Tax ID (EIN) 01-0661910

# Invoice

Date: 3/17/2017

Invoice Number: 16045126

**Your requested medical records are attached.**

Tracking #: MFTZ5FPABLWP7

Patient Name: OLUTOKUNBO EFUNNUGA

Medical Facility: Mercy Fitzgerald Hospital

Requester: Sheree Mobley-Bradham

Your reference number:

To pay by credit card, go to www.roilog.com and enter the tracking number and the invoice number as the request number.

| | |
|---|---|
| Search and Retrieval Fee: | $0.00 |
| Number of Pages: | 779 |
| Tier 1: | $77.90 |
| Tier 2: | $0.00 |
| Tier 3: | $0.00 |
| Media pages/materials: | 0 |
| Media fee: | $0.00 |
| Certification fee: | $0.00 |
| Adjustments: | $0.00 |
| Postage: | $13.51 |
| Sales Tax: | $5.48 |
| Total: | $96.89 |
| Paid at Facility: | $0.00 |
| Paid to MRO: | $0.00 |
| **Total Amount Due:** | **$96.89** |

Due upon receipt. Please return this invoice along with a check payable to:

**MRO**
**P.O. Box 6410**
**Southeastern, PA 19398-6410**

**Tax ID (EIN) 01-0661910**

**INVOICE FOR COPIES OF MEDICAL RECORDS**

MRO processes requests for copies of medical records on behalf of your healthcare provider. Federal and state laws permit healthcare providers and companies like MRO to charge patients a "reasonable, cost-based fee" for copies of their medical records. (See 45 C.F.R. § 164.524(c)(4)). Releasing medical records is a time and labor intensive process. This fee covers the costs associated with pulling, scanning, reproducing your records, and either printing them out or putting them on a CD for you to access. Pursuant to these laws, MRO has invoiced you for the copies of the medical records that you requested.

By paying this invoice, you are representing that you have reviewed and approved the charges and have agreed to pay them. Any dispute relating to this invoice must be presented before paying this invoice. Any dispute not so presented is waived. All disputes must be resolved by arbitration under the Federal Arbitration Act through one or more neutral arbitrators before the American Arbitration Association. Class arbitrations are not permitted. Disputes must be brought only in the claimant's individual capacity and not as a representative of a member or class. An arbitrator may not consolidate more than one person's claims nor preside over any form of class proceeding.

**Late Payment of Invoice Balance**

If MRO does not receive payment for the balance on your invoice for your records within 30 days **we may choose to pursue collections processing.**

FI-EDCG14

**Mercy Fitzgerald Hospital**
A member of Mercy Health System

Darby, PA 19023

P

# EMERGENCY RECORD

**Account No:** FA1307223089 **Date:** 10/07/16 **Time:** 0703 **Unit No:** F001250247

## PATIENT INFORMATION

**Name:** EFUNNUGA,OLUTOKUNBO
**Address:** 537 ORCHARD AVE
LANSDOWNE,PA 19050
**Phone:** (000)000-0000
**SSN:** XXX-XX-0000

**DOB:** 03/06/1979 **AGE:** 37
**SEX:** M **MS:** S
**RACE:** AA
**LANG:** UNKNOWN
**ADM Src/Prior:** HOM /ER
**Religion:** UNKNOWN
**Church:**

**Pt Status:** REG ER
**LOC/Srve:** FIER
**Room/Bed:**
**Accomodation:**
**Last DC Date:**

**Occurrence Code:** 11 **Occurrence Date:** 10/07/16

## PHYSICIAN INFORMATION

**Admitting Physician**

**Attending or ER Physician**
DOC,ED

**Primary Care Physician**
DOCTOR,NONE (FAMILY)

**Att Group:** .

## NEXT OF KIN

**Name:** UNK,UNK
**Addr:**

**Phone:** (000)000-0000
**Other:**
**Relat:** UNKNOWN

## PERSON TO NOTIFY

**Name:** UNK,UNK
**Addr:**

**Phone:** (000)000-0000
**Other:**
**Relat:** UNKNOWN

## EMPLOYER INFORMATION

**Name:** UNEMPLOYED
**Addr:**

**Phone:**

## GUARANTOR INFORMATION

**Name:** EFUNNUGA,OLUTOKUNBO
**Addr:** 537 ORCHARD AVE
LANSDOWNE,PA 19050
**Phone:** (000)000-0000
**SSN:** XXX-XX-0000
**Relat:** SELF / SAME AS

**Emp:** UNEMPLOYED
**Addr:**

**Phone:**
**Status:** UN

## INSURANCE INFORMATION

**Financial Class:** SP

| | SP | | | | |
|---|---|---|---|---|---|
| **Pri:** | SELF PAY | **INS#2:** | | **INS#3:** | |
| **Addr:** | | **Addr:** | | **Addr:** | |
| **Phone:** | | **Phone:** | | **Phone:** | |
| **Policy#:** | | **Policy#:** | | **Policy#:** | |
| **Group#:** | | **Group#:** | | **Group#:** | |
| **A#:** | | **A#:** | | **A#:** | |
| **Subscrb:** | | **Subscrb:** | | **Subscrb:** | |
| **Sub Emp:** | UNEMPLOYED | **Sub Emp:** | | **Sub Emp:** | |
| **Relation:** | SP | **Relation:** | | **Relation:** | |
| **Status:** | PENDING | **Status:** | | **Status:** | |

**INS#4:**

**Reason For Visit:** UNRESPONSIVE
**Comment:**
**ISOLATION:** **Privacy Notice Given?:** N **(Date:** )
**CO-Pay Collected:** N **Mode of Arrival:** AMBULANCE **COB Signed/Verified:**
**Registration Clerk:** FIBIXBYK
FIBIXBYK **email:** NA **use email:**

**Mercy Fitzgerald Hospital**
**EMERGENCY FLOW SHEET RECORD**
**Name: Efunnuga, Olutokunbo  Age: 37Y  MR: F001250247  Acct: FA1307223089**

| VITAL SIGNS | NJM | NJM | NJM | NJM | NJM |
|---|---|---|---|---|---|
| TIME | 10/7/2016 08:59 | 10/7/2016 07:51 | 10/7/2016 07:46 | 10/7/2016 07:44 | 10/7/2016 07:39 |
| BP | 113/79 | 142/91 | 144/97 | 139/94 | 146/98 |
| PULSE | –116– | –119– | –119– | –120– | –120– |
| RESP | –18– | –20– | –20– | –20– | –15– |
| TEMP | | | | | |
| PAIN | | | | | |
| O2 SAT | –100– on Ventilator | –100– on Ventilator | –100– on Ventilator | –100– on Ventilator | –100– |

| VITAL SIGNS | NJM | NJM | NDT1 |
|---|---|---|---|
| TIME | 10/7/2016 07:37 | 10/7/2016 07:28 | 10/7/2016 07:17 |
| BP | 149/96 | | |
| PULSE | –120– | | |
| RESP | | | |
| TEMP | | | 95.0 (Rectal) |
| PAIN | | 0 (No Complaint of Pain) | |
| O2 SAT | –100– on Ventilator | | |