# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OLUTOKUNBO EFUNNUGA
     Plaintiff,

  Vs.

STEVEN FARLEY
ERIC LEE
JEFFREY GILSON
STEVEN BLACKWELL
RICHARD ROSS
CITY OF PHILADELPHIA
     Defendants.

CIVIL ACTION No.: <u>18-924</u>
:
:
: THIRD AMENDED
  COMPLAINT FOR DAMAGES
  (42 U.S.C. § 1983)

FILED

APR 19 2019

KATE BARKMAN, Clerk
By_____Dep. Clerk



RECEIVED

APR 19 2019

PLAINTIFF ALLEGES:

## INTRODUCTION STATEMENT

1. This is an action for damages sustained by a citizen of the United States against police officers of the City of Philadelphia Police Department, who unlawfully harassed, arrested, assaulted and prosecuted the plaintiff.

2. The action is against the Police Commissioner as the supervisory officer, responsible for the conduct of defendants and for the Commissioner's failure to take corrective action with respect to the police personnel whose vicious propensities were notorious, to assure proper training and supervision of the personnel, or to implement meaningful procedures to discourage lawless official conduct, and against the City of Philadelphia as employer of the police personnel, which is sued as a person under 42 U.S.C. § 1983.

## JURISDICTION

3. This action is brought pursuant to 42 U.S.C. §§ 1983, 1988, the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and pursuant to 28 U.S.C. §§ 1331 and 1343(3), (4).

4. Jurisdiction lies over state law claims based on supplemental jurisdiction, as codified at 28 U.S.C. § 1367.

5. All the claims arose within the jurisdiction of this judicial district and involve Defendants who reside within the jurisdictional boundaries. Venue is proper under 28 U.S.C. § 1391(b) and (c).

## PARTIES

6. Plaintiff is a resident of Dagsboro, Delaware. At all times relevant to the allegations of this complaint was a citizen of United States, and a resident of Yeadon, Pennsylvania in the County of Delaware.

7. At all times relevant to this action, defendant Steven Farley was a police officer employed by the Philadelphia Police Department and issued the badge No. 4716, to perform duties in the City of Philadelphia and was assigned to the 19th District.

    a) At all relevant times, this defendant was acting as the agent, servant, and employee of defendant City of Philadelphia.

    b) This defendant is sued individually and in his official capacity.

8. At all times relevant to this action, defendant Eric Lee was a police officer employed by the Philadelphia Police Department and issued the badge No. 3351, to perform duties in the City of Philadelphia and was assigned to the 16th District.

    a) At all relevant times, this defendant was acting as the agent, servant, and employee of defendant City of Philadelphia.

    b) This defendant is sued individually and in his official capacity.

9. At all times relevant to this action, defendant Jeffrey Gilson was a Detective employed by the Philadelphia Police Department, and issued badge No. 7609, to perform duties in the City of Philadelphia and was assigned to the Southwest Detective Division.

    a) At all relevant times, this defendant was acting as the agent, servant, and employee of defendant City of Philadelphia.

    b) This defendant is sued individually and in his official capacity.

10. At all times relevant to this action, defendant Steven Blackwell was a detective employed by the Philadelphia Police Department, and issued the badge No. 9045, to perform duties in the City of Philadelphia and was assigned to the Southwest Detectives Division.

    a) At all relevant times, this defendant was acting as the agent, servant, and employee of defendant City of Philadelphia.

    b) This defendant is sued individually and in his official capacity.

11. At all times relevant to this action, defendant Richard Ross was the duly appointed Commissioner of the Philadelphia Police Department. In this capacity, the commissioner was:

    a) The commanding officer of defendants Steven Farley, Eric Lee, Jeffrey Gilson, and Steven Blackwell, and was responsible for their training, supervision and conduct.

    b) Responsible by law for enforcing the regulations of the Philadelphia Police Department and ensuring those Philadelphia Police personnel obey the laws of the State of Pennsylvania and the United States.

    c) Acting as the agent, servant, and employee of Defendant City of Philadelphia. This defendant is sued individually and in his official capacity.

12. The defendant City of Philadelphia is Municipal Corporation within the state of Pennsylvania and at all relevant times, it employed the other defendants in this action.

13. At all relevant times and in all their actions, the defendants were acting under color of State law pursuant to their authority as police personnel.

## FACTUAL ALLEGATIONS

14. On or about the 1st day of March 2016, at or about 10:30 pm, the plaintiff was on the premises of 728 North 63rd st., in Philadelphia Pennsylvania[1], in his professional Capacity as a property manager, lawfully addressing an electrical issue at the building. In do so, a disagreement between him and tenants of the building erupt into a physical altercation which began in the basement and spilled outside into the backyard and adjacent alleyway.

15. During the altercation, Plaintiff contacted the Police to report being assaulted. Defendants Steven Farley and Eric Lee were the first officers to arrive on the premises. Immediately upon initial interaction plaintiff was subjected to a "**stop and frisk**"[2].

16. Following a brief interrogation, the defendants thoroughly searched the person of the plaintiff which failed to produce any contraband. However three forms of identification were discovered on his person during, "**stop and frisk**", positively identifying him. The interrogation produced the facts that plaintiff was:

    a) Brother of the landlord;

    b) Not a resident of the property;

    c) Property manager of the building;

---

[1] Property is an apt building owned by Olukorede Efunnuga, and operated by Intellectual Property Management.

[2] "**Stop and Frisk**" is a constitutionally unsound practice of searching, seizing and detaining persons without reasonable suspicion or probable cause.

d) There to address an electrical issue in the unit of the property;

e) The complainant in the matter;

f) Summoned to the property from his business office. No reference was made to the basement as his office.

17. Defendants, with each others active approval, conducted a search and seizure in public without reasonable suspicion or probable cause. No reasonable basis existed for the actions taken against plaintiff...[3]

18. In attempt to resolve the situation, plaintiff was instructed to retrieve his personal effects and leave the premises. Of which he complied.

19. To gain access to the basement, a tenant of the building, Ibrahim Howard unlocked a gate to allow plaintiff entry. Ibrahim Howard then retained possession of the chain and lock used to secure the unit.

20. Plaintiff entered the basement, which had the power turned of at the time, to gather his tools and search for his personal car and home keys, which were lost in the altercation. At the same time, defendant Farley entered the basement without notice, consent or exigency and aided, with a flashlight, to retrieve plaintiffs keys.

21. The keys were easily observed by defendant Farley, using his flashlight, and both plaintiff and defendant exited the basement, with the defendant leading the way using the light from his flashlight, and plaintiff following closely behind him, first securing the interior door of the basement, then the exterior gate behind the both of them.

22. Once outside, and after a brief exchange with tenant Ibrahim Howard, in which Howard requested a heavy duty chain to secure the gate. Plaintiff, on his way to his vehicle which was parked approximately 10 cars distance from the patrol car, proceeded, first past defendant Farley, who remained in rear of building, then past defendant Lee, who was standing curbside by the patrol car in front of the property,.

23. At the same time, defendant Farley, allegedly reentered the basement, which was not locked but closed to the public, and conducted a search.

24. No exigent circumstances existed to justify the failure to obtain a warrant prior to conducting the search. The search was unreasonable and intrusive and served no legitimate government objective.

---

[3] No other persons present in the instant matter were subjected to **"Stop and Frisk"**.

25. Approximately 10 minutes later, upon his return from his vehicle with a heavy duty towing chain in his possession, plaintiff was violently seized, searched and arrested by defendant Farley, as Defendant Lee watched on.

26. In the process of the arrest, plaintiff was pushed up against the brick building, held at gunpoint and prodded with a gun in the hand of defendant Farley. Then plaintiff's possessions were removed from his person, which included a cell phone, his personal vehicle and home keys as well as a wallet containing $301.00 USD and three forms of identification:

a) Pennsylvania Drivers License

b) Delaware State Non Drivers License

c) Social Security Card

27. The personal searches, lacking probable cause, conducted of plaintiff and illegal detention of him by defendants constituted unreasonable and excessive force by the police officers. At the time and place, plaintiff was assaulted and battered by defendant Farley.

28. At the same time plaintiff was falsely, publicly and malicious accused of violating state narcotics laws. Plaintiff in no way instigated, caused, or contributed to the complained of conduct.

29. Although plaintiff professed his innocence, he was handcuffed behind his back as tenants and neighbors observed and walked across the premises of the property and public streets, while handcuffed, into an awaiting squad car belonging to defendants.

30. The arrest was not justified by probable cause or other legal privilege and the currency seized was not instruments of any unlawful activity.

31. At no time did the defendants have any reasonable or proper cause to:

a) Unlawfully search and seize plaintiff and his property $301.00;

b) Violently seize and arrest plaintiff against his will; or

c) Falsely accuse, harass assault, detain, and imprison him.

32. Plaintiff was placed into the back of a patrol car where he remained for approximately and hour. Within that time, other officers arrived and defendant Lee was removed from the premises by police personnel.

33. While detained in the rear of patrol car, plaintiff overheard conversations between defendant's Farley, Gilson, Blackwell and other police personnel regarding the circumstances of the arrest and searches. These conversations consisted of defendant Farley referring to plaintiff as a "smart ass" because of the manner in which he verbally asserted his legal rights. Defendant Farley acknowledged his wrongdoing in procedures and practice and repeatedly referred to the

circumstances using terms such as "clusterfuck", while confirming that plaintiff was on "parole and will sit anyway".

34. It was the first meeting of the minds by defendant Farley, Blackwell and Gilson , which served as pretext for the conspiracy to deprive plaintiff of his constitutionally protected rights and demonstrated an abuse of criminal and civil processes, resulting from the false arrest, false imprisonment.

35. Plaintiff was then removed from the premises and taken to the 19th district precinct, where he remained in the squad car while defendant Farley exited the vehicle and submitted documents. Plaintiff was subsequently transported to the 18th district precinct to be further processed, fingerprinted, and detained waiting charges to be filed against him.

36. A search warrant was sought against the property by defendant Steven Blackwell, the affiant. In his application for the warrant, defendant Blackwell falsely identified plaintiff as the owner of the property, in contradiction of the record and materially affecting the finding of probable cause; knowingly, intentionally, and with reckless disregard of the truth.

37. The true purpose of the falsified statement was a blatant exercise to mislead the issuing authority in believing that probable cause existed and granting an otherwise invalid search warrant.

38. The intentional and wrongful acts were committed in furtherance of a conspiracy to falsely imprison and maliciously prosecute the plaintiff.

39. According to the record check on the property made by defendant Gilson, plaintiff was not the owner of the property.

40. A search warrant was executed by defendant Gilson and Blackwell and charges were filed against the plaintiff. At not time was any defendant able to find a legitimate and legal basis for filing any criminal charges against plaintiff.

41. Preliminary arraignment was held on 3/3/16 on the following charges:

**a) 35 § 780-113 MANUFACTURE, DELIVERY MARIJUANA;**

**b) 35 § 780-113 USE/POSSESSION OF DRUG PARA.**

42. At the same time bail was fixed at $10,000.

43. Plaintiff was then transported from the 18th district precinct to the Curran-Fromhold Correctional Facility.

44. On or about the 3/4/16, bail was posted and plaintiff was released pending trial.

45. Upon his release and discovery that his keys were not in his property, plaintiff returned to the 19th district precinct to inquire with police personnel about the matter but was told that the arresting officers were unavailable.

46. On or about the 3/5/16, plaintiff returned to the 19th district precinct and was informed by defendant Farley that he had no knowledge of the where-about of the keys nor did he enter them into property.

47. As a direct and proximate result of the negligence indifference and callous disregard for the property of plaintiff in the care, custody and control of defendants, plaintiff's vehicle was accessed by persons without consent to do so using the unrecovered keys. Large sums of collected rent money, jewelry, and tools were stolen form the truck. Defendants owed a duty to the plaintiff and were responsible for the property of plaintiff that were removed from his person upon arrest, and were negligent in that manner.

48. Plaintiff was then forced to expend large sums of money to gain access into his home, to operate his vehicles and replace the keys that were lost.

49. On an unknown date between 3/10/16 and 4/28/16, while conducting repairs to a hot water heater in the basement of the property, defendant Farley and an unidentified officer, intruded into the property unannounced to harass the plaintiff. First, demanding that he stop what he was doing, then conducting a **"stop and frisk"**, before making snide comments and leaving with no explanation or reason.

50. The defendant recklessly conducted himself toward the plaintiff in a manner so outrageous and shocking that it exceeded all reasonable bounds of decency. As a result of the unlawful conduct of defendant, plaintiff has been caused to fear repetition of unlawful conduct by defendant and other police officer.

51. On another occasion within the above-mentioned time period, plaintiff was on the premises of said property performing lawn care duties. While loading his truck with equipment, defendant Farley and an unknown Officer pulled parallel in a patrol car and made threatening and harassing comments in attempt to intimidate plaintiff.

52. The acts of defendant Farley were extreme and outrageous and performed with the intention of causing severe emotional distress to plaintiff, in which they succeeded, with reckless disregard of the consequences which followed.

53. The acts of defendant Farley, and the stress of the judicial proceedings, culminated in the attempted suicide of plaintiff on the trial date in the criminal matter scheduled 10/7/16.

54. At the same time plaintiff was admitted to the Emergency room of Mercy Fitzgerald Hospital in critical condition. He remained in a comatose state and was transferred to the intensive care unit at the hospital until 11/2/16.

55. On or about the 2nd day of November 2016, plaintiff was arrested by the Darby Police for failure to appear in court and taken into custody at Delaware County Prison awaiting extradition to Philadelphia.

56. On or about the 8th day of November 2016, Plaintiff was removed from George W. Hill facility in Delaware County and taken into custody of Philadelphia to be detained at the Curran-Fromhold Correctional Facility, pending trial.

57. On the 13th day of March 2018, following a bi-furcated waiver trial presided over by the Honorable Judge Tracy Brandies-Roman, plaintiff was adjudged **NOT GUILTY** of all charges in the criminal matter.

I.
### *(VIOLATION OF SUPERVISED RELEASE)*

58. As a direct consequence of the criminal charges of plaintiff by defendants, a separate and related criminal action was initiated by the office of United States Probation and Parole alleging violations of terms and conditions of supervised release based on the allegations in the criminal matter in the Philadelphia Court of Common Pleas.

59. On or about the 14th day of March 2016, a request for revocation of supervised release was filed in the United States District Court for the Eastern District of Pennsylvania.

60. A summons was issued on 3/16/16 and hearing postpone pending the outcome of the criminal matter which gave rise to revocation.

61. On or about the 23rd day of May 2017, plaintiff was extradited from C.F.C.F in Philadelphia to federal custody and detained at Federal Detention Center, Philadelphia.

62. On 1/24/18, plaintiff was adjudged Guilty of violating terms and conditions of Federal supervised release and sentenced to 13 months incarceration with no term of supervised release to follow.

II.
### *(CIVIL FORFIETURE ACTION)*

63. On the 21st day of October 2016, a civil forfeiture action was initiated against $301.00 USD., *IN RE* Olutokunbo Efunnuga, Property receipt #: 3242363.

69. The acts and omissions described above, engaged in, under color of state authority by defendants, including defendant City of Philadelphia, sued as a person and responsible because of it's authorization, condonation, and ratification of the acts of it's agents, employees, and servants, deprived the plaintiff of rights secured to him by the Constitution of the United States, including, but not limited to the plaintiffs:

a) FIRST AMENDMENT RIGHT TO FREEDOM OF EXPRESSION;

b) FOUTH AMENDMENT RIGHT TO BE FREE FROM REASONABLE SEARCH AND SEIZURE OF HIS PERSON AND PROPERTY;

c) FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS OF LAW, INCLUDING THE RIGHT TO BE FREE FROM INJUSTIFIED AND EXCESSIVE FORCE UTILIZED BY THE POLICE; AND

d) EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

70. In addition, the defendants unconstitutional acts have caused the plaintiff to expend large sums of money for his legal defense and medical costs, to suffer loss of income, to suffer extreme indignities and humiliation, severe emotional distress, mental anguish, loss of liberty, loss of standing in the community, has been held up to ridicule before his peers, and will bare lasting and permanent mental and physical scars of the ordeal.

## SUPPLEMENTAL STATE CLAIMS

71. Plaintiff repeats and reiterates each and every allegation contained in the paragraphs of this complaint designated 1 to 67, inclusively with the same force and effect as though each were fully set forth at length here.

72. The acts and conduct alleged in paragraph 1 to 67 constitute torts under the laws of the state of Pennsylvania, including the torts of:

b) Illegal Search and Seizure;

a) False Arrest, False Imprisonment;

c) Failure to Intervene;

d) Excessive Force, Assault and Battery;

e) Invasion of Privacy;

f) Malicious Prosecution;

g) Intentional Infliction of Emotional Distress;

10

## CERTIFICATE OF SERVICE

I certify that, prior to 5:00 p.m. on <u>April 16, 2019</u>, I placed a true and correct copy of the attached <u>Affidavit</u> the forgoing Complaint, together with all attachments, exhibits, and supporting papers, in the United States mail, in [a] properly-addressed envelope[s], with first class postage duly paid and affixed to the envelope[s], and with the envelope[s] addressed to:

ATTN:<u>Meghan Claiborne</u>

City of Philadelphia Solicitors Office
<u>1515 ARCH St.</u>

Phliadelphia, PA <u>19102</u>

RESPECTFULLY SUBMITTED,

OLUTOKUNBO EFUNNUGA

DATE <u>4/12/19</u>

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OLUTOKUNBO EFUNNUGA
      Plaintiff,                 CIVIL ACTION No.: <u>18-924</u>

       :

Vs.

       :

STEVEN FARLEY                AMENDED
ERIC LEE                        AFFIDAVIT IN SUPPORT OF
JEFFREY GILSON              COMPLAINT FOR DAMAGES
STEVEN BLACKWELL     : (42 U.S.C. § 1983)
RICHARD ROSS
CITY OF PHILADELPHIA
      Defendants.

---

# <u>AFFIDAVIT OF OLUTOKUNBO EFUNNUGA</u>

State of: <u>New Jersey</u>

County of: <u>Cumberland</u>

Olutokunbo Efunnuga, being duly sworn, deposes and states:

    1. my name is Olutokunbo Efunnuga. I am over 18 years of age. I reside at Bayside State prison in Leesburg, New Jersey. I am fully competent to make this affidavit and I have personal knowledge of the facts stated in this affidavit. To my knowledge, all of the facts stated in this affidavit are true and correct.

    2. I am the plaintiff in this matter. I make this affidavit in support of the forgoing 42 U.S.C. § 1983 Amended Complaint for damages.

    3. On or about the 1st day of March 2016, at or about 10:30 pm, I was arrested on the premises of 728 North 63rd St., Philadelphia, Pennsylvania, and charged with possession of a controlled substance, (marijuana), and possession of drug paraphernalia. The property is red brick and stone faced, twin, three story house with an adjacent walkway on one side, separating it from the next house. In the rear of the property is a small backyard with masonry wall and cyclone gate providing access to rear alleyway.

1

4. It is a multi-unit residential building with four housing units and an unfinished basement. It is comprised of a one bedroom apartment on the first floor; a two bedroom apartment on the third floor; two efficiency style rooms on the second floor; and a basement used for storage and utilities.

5. The basement's dimensions are approximately 30X110 ft., which has three separate rooms divided by drywall partitions. There is a front porch that provides access to the first floor apartment only. A rear porch provides access to the 1st, 2nd, and 3rd floor units. Underneath the rear porch is the only access to the basement unit.

6. All residents are responsible for their own utilities except for two efficiency style rooms on second floor. These residential rooms are on rooming leases and their utilities are in the landlord's name. Tenants of a second floor unit were delinquent on rent and the utilities were disrupted. Instead of satisfying the outstanding payment, they began to access the basement without permission to illegally restore power to their unit.

7. On the day of the arrest, I was responding to reports from other residents complaining of noise disturbances, electrical problems and unlawful access into the basement unit. The basement unit is generally restricted to residents. At approximately 9:30 p.m. on 3/1/16, I arrived on the premises to address the issue.

8. As I arrived at the property, I was met by a tenant of the property, Ibrahim Howard, who also aides in maintaining the property by performing odd jobs such as snow removal and trash collection for a reduced monthly rent. Mr. Howard had the only keys to a chain and lock that he placed on the metal gate that secured the basement unit. I was told that he placed the chain and lock there after the original chain and lock was broken.

9. When I arrived he unlocked the basement allowing me access to it. We entered the unit and I began to disconnect the power to the second floor room using the electrical panel. As I was doing so, residents and non residents from the second floor entered into the basement and confronted me. Approximately 5 or 6 people surrounded me in an aggressive manner, and a confrontation ensued. Before I could explain who I was and my reason for being there, I was struck in the face by an unknown tall individual. In my defense, I instinctively retaliated with counterpunches and a full on fistfight began. Other people joined the attack against me and very quickly it turned into a brawl. Ibrahim Howard attempted to quell the altercation, which provided me with an opportunity to dial "911" to report the assault.

10. It took the police about 15 minutes to arrive. By the time they arrived the commotion had moved to the backyard and adjacent walkway, and the crowd had increased in size to approximately 10 to 12 people.

11. Police Officers' Steven Farley and Eric Lee were the first responders on the premises. Upon their approach, I was subjected to a personal search or "frisk". My wallet was removed from my pocket containing 3 forms of personal identification as well as money. I was separated from the other people present and interrogated on the matter. Officer Lee and I remained in the adjacent alleyway while Officer Farley joined the crowd of people in the rear of the building and the backyard.

12. In my answers in the interrogation, I proffered that I was the brother of the landlord, while also acting as the property manager. My purpose for being there that evening was to address an issue with the electricity to one of the units in the building, and while attempting to achieve that objective, I was confronted and attacked by unknown persons that were still present.

13. I continued to explain how I was the complainant in the matter but my complaint was completely ignored. At the same time Officer Farley approached with and irate and combative tone, questioning the truthfulness of my claims. I stated that I was assaulted by members of the crowd and turned around to show the physical injuries that I sustained as result. I requested that inquiries be made to confirm my claim. Officer Farley radioed dispatch, who, in deed confirmed my claims and he took an even more hostile and confrontational tone towards me. Officer Farley stated that police had received multiple complaints that day of disruption of electricity and other disturbances from the property. He continued that it was illegal to disrupt the utility services and ordered me to leave the premises or be subjected to arrest.

14. My reply was that I was the property manager and had every legal right to be there and also to disrupt the electricity, as it was in the name of the landlord. I said that I was responding to numerous phone calls of people breaking in and entering the basement, illegal use of electricity, and was contacted by the owner of the property at my office and ordered to the property to resolve the issue and disconnect the electricity.

15. Officer Farley was not pleased with my reply. He called me a "smart ass", snatched my driver's license from my hand and instructed me to walk towards the front of the building and into the street to a parked patrol car.

16. Upon arriving at the squad car, Officer Farley opened the front passenger door towards the sidewalk, sat down on the passenger side, made calls on the police radio, and then began to enter information into a digital device located on the center console of the vehicle. At

3

the same time Officer Lee and I stood outside the car on the sidewalk engaged in conversation pertaining to his personal experiences with the business and he expressed his empathy with my situation.

17. While still in conversation with Officer Lee, Officer Farley returned my drivers license and stated that an inquiry into my identity returned that I was on federal supervised release and that if I didn't "get outta here now", he would "send your ass to jail for violating". I refused to be intimidated and replied that I had done nothing wrong and reminded him that I was the complainant in the matter, yet I was being treated with indifference. He responded, "Leave now before I change my mind, and if you return tonight and we are called again, you will be arrested".

18. I complied with the orders and informed the officers that I would need to return into the basement to retrieve my personal belongings, which included my tools and car keys that were misplaced during the altercation. Officer Farley returned my identification and I proceeded to walk back towards the property, through the adjacent alleyway and to the entrance of the basement, in the rear of the building, where the crowd of people were still congregated.

19. The total time I spent in the front of the property at the police vehicle conversing with Officers Farley and Lee was approximately 10 minutes. At no time while in the front of the property was I able to see the activity of the people in the rear of the building as it would be physically impossible to do so from that vantage point.

20. Upon arriving at the back of the building, and the entrance of the basement, I noticed that the metal gate of the basement was locked with a chain and key lock. At no time upon exiting the basement following the earlier events did I observe anyone replace the chain and lock on the gate, so I was frustrated to see it locked.

21. In a harsh tone, I demanded that the lock and chain be removed immediately. Ibrahim Howard, the sole possessor of the keys to the lock, removed the lock and chain and retained possession of them. At that time I expressed deep frustrations with the lock being placed on the gate as I could not comprehend why access would be denied to anyone while the police was still here, and matters unresolved in there entirety. I was unaware of any justifiable reason that anyone would want to deny access to the unit at that time and place.

22. I proceeded to enter the basement and immediately noticed that the lights were not on. With limited light visibility, I canvassed the area immediately surrounding the electrical panels, which were fixed to a masonry wall approximately 10feet immediately to the left upon entering the interior wooden door of the basement.

4

23. At the same time Officer Farley entered the basement, unannounced, without notice or consent and with the light from his flashlight and aided in my search for the afore-mentioned items. I quickly recovered my tools and he pointed out my keys on a shelf. I thanked him and he led the way out of the basement with his light, as he was closer to the exits than I was and I was deeper into the unit.

24. I made sure to close the interior wooden door behind us, which did not have a door knob, hardware, or locking mechanism. I shut the metal gate at the entranceway effectively securing the property while aware that Ibrahim Howard would further secure it with the lock and chain he had in his possession.

25. Once outside, I ascended 4 or 5 steps leading out of the basement stairwell and noticed Ibrahim Howard standing on the rear porch, directly above the basement entranceway. He had a chain and lock in his possession and inquired if I had a more heavy duty chain to better secure the basement with, which would prevent another occurrence of a break in. I shook my head in acknowledgment and proceeded past Officer Farley, who remained in the rear of the building with Ibrahim Howard and approximately 8 to 10 other people.

26. I walked through the alleyway on the side of building and to the front of the building past the front porch and down to the front sidewalk where Officer Lee was standing by a parked patrol car. My vehicle was approximately 10 cars lengths away from the police cruiser.

27. I approached my truck, a 2003 Dodge Ram 1500, and unlocked it with an electronic keyless entry remote control. I placed my tools in the rear seat, then removed a heavy-duty tow chain from a gang-box in the truck bed, and returned to the property.

28. I again walked past Officer Lee, who, at that time was sitting in the front passenger seat of the patrol car with the door ajar. I proceeded to the building and as I entered the adjacent alleyway leading to the back of the property, I noticed Officer Farley approaching rapidly. As I came within four feet of him, I observed him reach for his side arm and draw his service weapon.

29. At the same time he shouted for me to drop the chain and put my hands in the air. He then violently grabbed my arm while twisting it and forcing my body against the red brick building wall and handcuffed my hands behind my back.

30. I did not resist, but I protested as I was placed under arrest and accused of possession of drugs with the intent to deliver.

31. I was searched by Officer Farley, while Officer Lee looked on, and my cell phone, keys, and wallet, (containing 3 forms of I.D. and $301.00 USD), was removed from my person.

32. I was walked across the front of the house as neighbors and tenants observed, then placed into the back seat of the patrol car by Officer Farley. I remained in the car, which was parked in the front of the property for a considerable amount of time.

33. While detained in the squad car, I observed Officer Lee removed from the premises by other police personnel.

34. I observed officers, who I later determined to be Detective Blackwell and Gilson arrive and engage in conversations with Officer Farley.

35. In those conversations I heard Officer Farley explain events that occurred that evening. He spoke of our first encounter and expressed distain in my replies to his interrogation. He used the term "smart ass" to refer to the manner of my replies.

36. Officer Farley explained to officer Gilson and Blackwell, how he reentered the basement of the property once I left to go to my truck and conducted a search because he smelled marijuana. He used the term "Clusterfuck" to refer the totality of circumstances leading to the arrest.

37. Officer Farley explained that he did a check and knew I was on parole and "fuck it, it doesn't matter he will sit anyway". I interpreted that to mean that because I was on supervised release from Federal custody, Officer Farley felt that I would be detained in prison throughout the criminal proceedings and would have served a considerable amount of time before a trial had commenced and I was proved not guilty. Because of his experience and knowledge of the consequences that criminal charges placed on a person in my position would have, he chose to proceed in that manner.

38. I observed police personnel walking to and from the rear of the property with items of packaging and documents in their hands for approximately one hour. Within that time I overheard Officer Farley explain to other Police personnel, on the phone and radio, how the circumstances were a "clusterfuck".

39. I was then removed from the property, by Officer Farley, and taken to the rear entrance of the 19th district precinct. As I remained seated in the rear of the patrol car, Officer Farley filled out paperwork. After some time he exited the vehicle with the documents, entered the police station and returned without the documents.

40. I was then removed from that location and taken, by Officer Farley to the 18th district precinct, were I was uncuffed, searched and further proceed to be placed into confinement.

41. Hours went by and I appeared before judicial authorities and formally charged. I was permitted a phone call after bail was set at $10,000.

6

42. On 3/3/2016, I was transported to the Curran-Fromhold Correctional Facility. Upon my arrival, I was processed then housed.

43. On 3/4/16 I was released on bond pending trial. My property was returned, however, I noticed that my keys were missing and not on my property receipt. I immediately returned to 728 North 63rd st. and discovered that my truck had been accessed without evidence of a break in. All my tools were stolen as well as jewelry and $1,200.00 USD.

44. On the same day, I returned to the 19th district precinct to inquire with police personnel regarding my keys. I was told that the keys would have been in the care, custody and control of the arresting officer to enter into my property or evidence, of which neither was done.

45. I was also made aware that the arresting officer was unavailable and to return the next day to inquire directly with him.

46. On or about 3/5/2016, I return to the 19th district precinct and spoke with Officer Farley, who was surprised to see me free, He scoffed at my inquiry and treated me with contempt and indifference. He made it clear to me that he was not interested in helping me and did not know what happened to my keys.

47. I was forced to incur the expenses of having keys made to operate my vehicles and access my home.

48. I continued to conduct my duties as a property manager at said property. On two separate occasions Officer Farley retuned and harassed me.

50. At an unknown date between 3/5/16 and 4/28/16, I was in the basement at said property conducting repairs to a hot water heater and suddenly Officer Farley and an unidentified Officer was standing directly above me. I was taken by complete surprise and I demanded to know what reason they had to be in the private property without announcing an entry. He replied, in an indifferent tone that he was "none of my business" and questioned me on what I was doing to the appliance.

51. At the same time I was instructed to stand up, raise my hands above my head and submit to a "frisk". I replied that I thought it to be totally outrageous for him to be in the property again without consent and his response was "aren't you in enough trouble. I thought you were on parole; why aren't you still in jail."

52. Officer Farley then took the kneeling position that I had previously been in and with his flashlight looked over the work that I conducting. After a few moments he and the other Officer simply left without incident. I was very disturbed by the event and never fully recovered

from it. It was complete invasion of my privacy and I henceforth feared retaliation from Officer Farley and repeat similar conduct from other law enforcement.

53. I made no inquiry of the matter of that date simply out of fear and intimidation, although I fully believed that the events of that day were completely out of line and improper. I never found out who made a complaint or if any was made at all. Nor did I believe it to be in my best personnel interest to report the incident.

54. At or about the same time frame as above, but on a subsequent date, I was conducting lawn care duties on the premises of or said property. I double parked my truck in the passing lane of 63rd st, directly in front of the property and began loading my equipment onto the bed, with my emergency signals on. As I did so, Officer Farley pulled parallel to me and in attempts to harass me and intimidate me, he made snide comments and instructed me to remove my vehicle or he would issue me a ticket. I complied.

55. At the same time a separate but related criminal action was being brought against me by the United States Office of Probation and Parole.

56. On or about the 14th day of March 2016, a request for revocation of federal supervised release was filed alleging violations of terms and conditions of supervised release based on the allegations of the criminal charges in Philadelphia.

57. A summons was issued on 3/16/16, and hearings postponed pending the outcome of the criminal matter which gave rise to revocation.

58. The compounded effects of the legal actions against me, harassment, fear and intimidation from Officer farley and law enforcement, loss of income and legal defense fees, as well as my preexisting clinical depression and anxiety disorders, all reached a degree that I could no longer emotionally cope.

59. On the 7th day of October 2016, the scheduled day of trial, and facing insurmountable pressures and an uncertain future, I felt I had no other option than to take my own life and end the oppressive conditions that I was subjected to.

60. While unconscious and in a comatose state , I was rushed to the emergency room of Mercy Fitzgerald Hospital, which was the closest, approximately, 1/2 a mile away from my home at 537 Orchard Ave. in Yeadon, Pennsylvania.

61. Although I remember little of the time spent in the hospital, as I was in and out of consciousness throughout the ordeal, I was contracted pneumonia, was subject to multiple life saving surgeries, countless serious medical procedures, and incurred hundreds of thousands of dollars in medical expenses as a result.

8

62. On or about the 21st day of October 2016, while in a coma, civil forfeiture actions were initiated against my property $301.00 USD, that was confiscated from my pockets by Officer Farley at the time of my arrest.

63. On or about the 2nd day of November 2016, after regaining consciousness I was arrested by Darby Police and taken into custody to await extradition to Philadelphia on a felony warrant for failure to appear to trial on 10/7/2016.

64. I remained in the medical ward of George W. Hill prison in Delaware County until 11/8/16, when I was taken into custody of the Philadelphia Sheriffs and transported to Curran-Fromhold Correctional Facility to be detained pending trial.

65. I remained there throughout extensive and exhausting criminal proceedings until 5/23/17, when I was extradited to federal custody on an outstanding warrant for violation of supervised release.

66. I was housed at the federal detention center in Philadelphia thought the remainder of the criminal proceedings in Philadelphia Court of common Pleas.

67. On or about the 24th day of January 2018, I stipulated to being found guilty of violating terms and conditions of federal supervised release and was sentenced, by the Honorable Paul S. diamond, to 13 months imprisonment and no further term of supervised release.

68. On the 13th day of March 2018, following a bi-furcated waiver trial, I was adjudicated not guilty of all charges by the Honorable Tracy Brandies-Roman.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS _11th_ DAY OF _APRIL_ 20 _19_.

_____
NOTARY PUBLIC OF NEW JERSEY

OLUTOKUNBO EFUNNUGA
Plaintiff, Pro Se.

DATE _4/11/19_

MARSHALL DIEHL
Notary Public of New Jersey
My Commission Expires February 7, 2021

9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OLUTOKUNBO EFUNNUGA
      Plaintiff,                   CIVIL ACTION No.: <u>18-924</u>
                                      :

    Vs.
                                        :

STEVEN FARLEY                      CIVIL COUNTS
ERIC LEE
JEFFREY GILSON
STEVEN BLACKWELL                   :
RICHARD ROSS
CITY OF PHILADELPHIA
      Defendants.

---

The following defendants are liable for damages, for the torts of:

## COUNT I.  <u>FALSE ARREST AND FALSE IMPRISONMENT</u>
    1. Steven Farley
    2. Eric Lee

## COUNT II.  <u>ILLEGAL SEARCH AND SEIZURE</u>
    1. Steven Farley
    2. Eric Lee
    3. Jeffrey Gilson
    4. Steven Blackwell

## COUNT III.  <u>FAILURE TO INTERVENE</u>
    1. Eric Lee

## COUNT IV.  <u>EXCESSIVE FORCE, ASSUALT AND BATTERY</u>
    1 Steven Farley

## COUNT V.  <u>INVASION OF PRIVACY</u>
    1. Steven Farley
    2. Eric Lee
    3. Jeffrey Gilson
    4. Steven Blackwell

## COUNT VI.  <u>MALICIOUS PROSECUTION</u>
    1. Richard Ross
    2. Steven Farley

3. Jeffrey Gilson
4. Steven Blackwell
5. CITY OF PHILADELPHIA

**COUNT VII.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
1. Steven Farley
2. CITY OF PHILADELPHIA

**COUNT VIII.  ABUSE OF PROCESS**
1. Steven Farley
2. Jeffrey Gilson
3. Steven Blackwell
4. Eric Lee

**COUNT IX.   CIVIL CONSPIRACY**
1. Steven Farley
2. Jeffrey Gilson
3. Steven Blackwell

**COUNT X.    NEGLIGENCE AND GROSS NEGILGENCE**
1. Steven Farley
2. Eric Lee
3. Jeffrey Gilson
4. Steven Blackwell
5. Richard Ross
6. CITY OF PHILADELPHIA.

RESPECTFULLY SUBMITTED,

OLUTOKUNBO EFUNNUGA
DATE:4/15/19

#1192538 / 957866-G

Bayside State Prison

P.O. Box F-1

Leesburg, N.J. 08327

Clerk of Court
2609 U.S. Courthouse
601 Market St.
Phila, PA 19106

MAILED FROM A
NEW JERSEY
CORRECTIONAL FACILITY

U.S.M.S.
X-RAY
MAILED FROM A
NEW JERSEY
CORRECTIONAL FACILITY

FOREVER

APR 17 2019

USPS-08081